UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MILLER & CHEVALIER CHARTERED<br>655 Fifteenth Street, NW, Suite 900<br>Washington, D.C. 20005,<br><br>    Plaintiff,<br><br>  v.<br><br>INTERNAL REVENUE SERVICE<br>1111 Constitution Avenue, NW<br>Washington, D.C. 20224,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. |

## PLAINTIFF'S ORIGINAL COMPLAINT

Miller & Chevalier Chartered ("Plaintiff"), for its complaint herein, alleges as follows.

1.    Plaintiff brings this complaint under section 552 of the Freedom of Information Act ("FOIA") (5 U.S.C. § 552), as amended, to order the production of agency records.

## THE PARTIES

2.    Plaintiff is a District of Columbia professional corporation.  Plaintiff's principal place of business is located at 655 Fifteenth Street, NW, Suite 900, Washington, D.C. 20005.

3.    Plaintiff's Employer Identification Number is 51-1212890.

4.    Defendant is the Internal Revenue Service ("IRS"), an agency of the United States government.

5.    Defendant has possession and control of the records requested by Plaintiff.

6.     The actions complained of herein were taken by representatives of the Commissioner of the Internal Revenue Service.

## JURISDICTION AND VENUE

7.     Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B).

8.     Venue is proper within this District pursuant to 5 U.S.C. § 552 because Plaintiff's principal place of business is within this judicial district.

## RELIEF SOUGHT

9.     Plaintiff seeks to compel production of documents responsive to the FOIA requests it submitted to Defendant on April 6, 2005; January 27, 2006; and February 24, 2006.

## COUNT I

(April 6, 2005, FOIA Request)

10.     On April 6, 2005, Plaintiff sent Defendant a FOIA request (a copy of which is attached hereto as Exhibit A) for the following documents:

a.     a copy of the transmittal memorandum dated April 9, 1968, which accompanied T.D. 6952, and which is referenced on page three of the copy of the transmittal memorandum for T.D. 6998 enclosed with the April 6, 2005, FOIA request; and

b.     a copy of the memorandum that was originally attached to the transmittal memorandum for T.D. 6998 and that was referred to on page ten of the copy of the transmittal memorandum for T.D. 6998 as a "memorandum containing more detail on this subject from this office to the office of the Assistant Commissioner (Technical)."

11.    On June 4, 2007, over two years after Plaintiff submitted its April 6, 2005, FOIA Request, Defendant issued an initial determination (the "Initial Determination") (a copy of which is attached hereto as Exhibit B), denying in full Plaintiff's April 6, 2005, FOIA request.

12.    On June 29, 2007, pursuant to FOIA § 552(a)(6)(A)(i) and Treas. Reg. § 601.702(c)(10), Plaintiff submitted a timely administrative appeal of the Initial Determination to the Commissioner of Internal Revenue (the "Administrative Appeal") (a copy of which is attached hereto as Exhibit C).

13.    On July 11, 2007, Defendant notified Plaintiff by letter (a copy of which is attached hereto as Exhibit D) that Defendant had received the Administrative Appeal on July 5, 2007; that Defendant had twenty business days from that date to complete consideration of Plaintiff's Administrative Appeal; and that Plaintiff could seek judicial review upon Defendant's failure to complete Plaintiff's case in that time frame.

14.    As of the date of this Complaint, Defendant has not provided the responses to Plaintiff's Administrative Appeal required by the applicable statute and regulations, nor has it disclosed any of the requested materials. Under FOIA § 552(a)(6)(A)(ii) and Treas. Reg. § 601.702(c)(10), Defendant must make a determination to affirm the initial denial (in whole or in part) or to grant the request for records and must mail notification of the determination within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of an administrative appeal, unless unusual circumstances (as specified in FOIA § 552(a)(6)(B)(iii) and Treas. Reg. § 601.702(c)(11)) exist. Under FOIA § 552(a)(6)(B)(i) and Treas. Reg. § 601.702(c)(11), if unusual circumstances exist, Defendant may extend the 20-day time limit by up to ten days by written notice to the person making the FOIA request. Defendant's letter of July 11, 2007, indicated that Defendant would not extend the 20-day time limit. Over twenty

days (excluding Saturdays, Sundays, and legal holidays) have passed since Defendant received Plaintiff's Administrative Appeal, and Plaintiff has not received notification of a determination. Therefore, Defendant has failed to respond to Plaintiff's appeal within the statutorily provided period.

15.    Under FOIA § 552(a)(6)(c)(i) and Treas. Reg. § 601.702(c)(12), Plaintiff has exhausted its administrative remedies with respect to its April 6, 2005, FOIA request. Plaintiff is therefore entitled to judicial review under FOIA § 552(a)(4) and Treas. Reg. § 601.702(c)(13).

16.    Plaintiff has a statutory right, pursuant to FOIA § 552(a)(3), to the records it seeks, and there is no legal basis for Defendant's failure to respond to Plaintiff's request and to disclose the requested materials, or to claim statutory exemptions from disclosure for any requested materials that are withheld.

COUNT II

(January 27, 2006, FOIA Request)

17.    On January 27, 2006, Plaintiff sent Defendant a FOIA request (a copy of which is attached hereto as Exhibit E) for all background, administrative, and legal materials, including, but not limited to, internal IRS memoranda, hearing transcripts, analyses, and public comments filed regarding section 1.482-2(b) of the Treasury Regulations from 1965 through 1969, including:

      a.    Regulations proposed in April, 1965 (30 Fed.Reg. 4256);

      b.    Regulations withdrawn and reproposed in August, 1968 (31 Fed.Reg. 10394);

      c.    Final Regulations, T.D. 6952, issued in April, 1968 (33 Fed.Reg. 5848);

      d.    Changes to regulations proposed in April, 1968 (33 Fed. Reg. 5858); and

- 4 -

      e.     Final Regulation, T.D. 6998, issued in January, 1969 (34 Fed.Reg. 933).

18.     As of the date of this Complaint, Defendant has not provided the responses to the requests required by the applicable statute and regulations, nor has it disclosed any of the requested materials. Moreover, Defendant has never issued a determination with regard to this request. Under FOIA § 552(a)(6)(A)(i) and Treas. Reg. § 601.702(c)(9), Defendant must determine within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of a FOIA request whether to comply with such request and must immediately notify the person making such request of such determination, unless unusual circumstances (as specified in FOIA § 552(a)(6)(B)(iii) and Treas. Reg. § 601.702(c)(11)) exist. Under FOIA § 552(a)(6)(B)(i) and Treas. Reg. § 601.702(c)(11), if unusual circumstances exist, Defendant may extend the 20-day time limit by up to ten days by written notice to the person making the FOIA request. Over thirty days (excluding Saturdays, Sundays, and legal holidays) have passed since Plaintiff's FOIA request was filed on January 27, 2006, and Plaintiff has not received notification of a determination. Therefore, even if unusual circumstances existed, Defendant nevertheless has failed to respond to Plaintiff's FOIA request within the statutorily provided period.

19.     Under FOIA § 552(a)(6)(c)(i) and Treas. Reg. § 601.702(c)(12), Plaintiff has exhausted its administrative remedies with respect to its January 27, 2006, FOIA request. Plaintiff is therefore entitled to judicial review under FOIA § 552(a)(4) and Treas. Reg. § 601.702(c)(13).

20.     Plaintiff has a statutory right, pursuant to FOIA § 552(a)(3), to the records it seeks, and there is no legal basis for Defendant's failure to respond to Plaintiff's request and to disclose the requested materials, or to claim statutory exemptions from disclosure for any requested materials that are withheld.

<u>COUNT III</u>

(February 24, 2006, FOIA Request)

21.        On February 24, 2006, Plaintiff sent Defendant a FOIA request (a copy of which is attached hereto as Exhibit F) for all background, administrative, and legal materials, including, but not limited to, internal IRS memoranda, hearing transcripts, analyses, and public comments filed regarding IRS Notice of Proposed Rulemaking for REG-146893-02 and REG-115037-00 (68 Fed.Reg. 53448, 9/10/2003).

22.        As of the date of this Complaint, Defendant has not provided the responses to the requests required by the applicable statute and regulations, nor has it disclosed any of the requested materials.  Moreover, Defendant has never issued a determination with regard to this request.  Under FOIA § 552(a)(6)(A)(i) and Treas. Reg. § 601.702(c)(9), Defendant must determine within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of a FOIA request whether to comply with such request and must immediately notify the person making such request of such determination, unless unusual circumstances (as specified in FOIA § 552(a)(6)(B)(iii) and Treas. Reg. § 601.702(c)(11)) exist.  Under FOIA § 552(a)(6)(B)(i) and Treas. Reg. § 601.702(c)(11), if unusual circumstances exist, Defendant may extend the 20-day time limit by up to ten days by written notice to the person making the FOIA request.  Over thirty days (excluding Saturdays, Sundays, and legal holidays) have passed since Plaintiff's FOIA request was filed on February 24, 2006, and Plaintiff has not received notification of a determination.  Therefore, even if unusual circumstances existed, Defendant nevertheless has failed to respond to Plaintiff's FOIA request within the statutorily provided period.

23.        Under FOIA § 552(a)(6)(c)(i) and Treas. Reg. § 601.702(c)(12), Plaintiff has exhausted its administrative remedies with respect to its February 24, 2006, FOIA request.

- 6 -

Plaintiff is therefore entitled to judicial review under FOIA § 552(a)(4) and Treas. Reg. § 601.702(c)(13).

24.    Plaintiff has a statutory right, pursuant to FOIA § 552(a)(3), to the records it seeks, and there is no legal basis for Defendant's failure to respond to Plaintiff's request and to disclose the requested materials, or to claim statutory exemptions from disclosure for any requested materials that are withheld.

WHEREFORE, Plaintiff prays that this Court:

(1)    Declare that Defendant's failure to disclose the records requested by Plaintiff is unlawful;

(2)    Order that Defendant immediately provide the requested records to Plaintiff; and

(3)    Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Shane T. Hamilton
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, D.C.  20005-5701
Phone:  (202) 626-5800
Facsimile:  (202) 626-5801
E-mail:  shamilton@milchev.com
D.C. Bar Number:  459320

Kevin L. Kenworthy
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, D.C.  20005-5701
Phone:  (202) 626-5800
Facsimile:  (202) 626-5801
E-mail:  kkenworthy@milchev.com
D.C. Bar Number:  414887

Counsel for Plaintiff

Date:  August _14_, 2007

Of Counsel:

Kathryn Morrison Sneade
    Miller & Chevalier Chartered

# Exhibit A

**M I L L E R   &   C H E V A L I E R**
CHARTERED

655 FIFTEENTH STREET, N.W.   SUITE 900
WASHINGTON, D.C.  20005-5701
(202) 626-5800   FAX: (202) 628-0858

(202) 626-6094
April 6, 2005

HQ Disclosure Office
1111 Constitution Ave, NW
Room 1571
Washington, DC 20224

Dear Sirs:

Please provide me with copies of the following material under the Freedom of Information Act, IRC
§ 6110 as applicable, and your agency's implementing regulations:

> The <u>transmittal memorandum</u> dated April 9, 1968, which accompanied TD 6952 (as
> referenced on p.3 of attached TM for TD 6998).
> A copy of the, "memorandum containing more detail on this subject from this office to
> the office of the Assistant Commissioner (Technical)," originally attached to the
> transmittal memorandum for TD 6998.  (Referenced on p.10 of the attached TM
> for TD 6998).

If for any reason you determine that portions of the requested information are exempt from disclosure
under FOIA, please delete the allegedly exempt material, inform me of the basis for the claimed
exemption, and furnish me with copies of those portions of the document that you determine not to be
exempt.  My consent to such deletion at this time is designed to facilitate your prompt response and in
no way waives my right to appeal any determination that you may make regarding the applicability of
any FOIA exemptions to the requested documents and information.

In compliance with applicable regulations under §601.702(f)(3)(A), "Commercial Use Requester," we
promise to pay reasonable charges for search, copying and review costs.  I understand that I can
expect a response within 20 days of your receipt of this letter.

If you have any questions about this request, I may be reached at: (202) 626-6094.  I look forward to
your response within twenty days, or earlier if possible.  Thank you.

Sincerely,

Carol Gruenburg
Director of Library Services

Enc. (1)

I

1969 TM LEXIS 16, *

1969 TM LEXIS 16

T.D. 6998

"This document is not to be relied upon or otherwise cited as precedent by taxpayers."

Treasury decision--Allocation of income and deductions among taxpayers.

January 14, 1969

**REFERENCE:** [*1]

CC:LR-482-2
Br5:SAN

**TEXT:**
MEMORANDUM FOR: Honorable Stanley S. Surrey Assistant Secretary of the Treasury

There is transmitted herewith, with the recommendation that it be approved, a proposed Treasury decision containing an amendment to the Income Tax Regulations (26 CFR Part 1) under section 482 of the Internal Revenue Code of 1954, relating to the allocation of income and deductions among taxpayers.

A proposed amendment to the regulations was first published with notice of proposed rule making in the Federal Register for April 1, 1965 (30 F.R. 4256) and on August 2, 1966, the notice of April 1, 1965 was withdrawn and a new notice of proposed rule making was published in the Federal Register (31 F.R. 10394). On April 16, 1968, Treasury Decision 6952 covering all the proposed amendments to the regulations under section 482 with the exception of § 1.482-2 (b) (7) was published in the Federal Register (33 F.R. 5848). Also on April 16, 1968, a new notice of proposed rule making was published in the Federal Register (33 F.R. 5858) with respect to § 1.482-2 (b) (7) and § 1.482-2 (b) (3). Revenue Procedure 68-22 was announced simultaneously with the new notice of proposed rule making [*2] by issuance of T.I.R. 975. This Revenue Procedure provided that in examining income tax returns, making allocations, and disposing of cases for taxable years beginning prior to May 1, 1968, the Service would, when requested to do so by the taxpayer, apply the provisions of subparagraphs (3) and (7) of § 1.482-2 (b) of the proposed regulations as published in the Federal Register on August 2, 1966. Numerous written comments were received from the public and public hearings were held on June 18, 1968.

The proposed amendment to the regulations under section 861, relating to sources of income, which was published in the notice of proposed rule making in the Federal

2

Register for August 2, 1966, has not been finalized and that notice remains in effect.

Subparagraph (3) of § 1.482-2 (b) provides that, except in the case of certain services, an arm's length charge for the rendition of services will be deemed equal to the costs or deductions incurred. Along with the addition of a cross-reference to subparagraph (7), a new sentence has been added to the effect that, in order to avail themselves of the cost safe haven or the objective tests in subparagraph (7) which are based on costs, [*3] taxpayers must maintain books and records which will enable the Internal Revenue Service to verify the costs involved.

Subparagraph (7) of § 1.482-2 (b) describes those situations in which the rendition of services for related entities will not be deemed equal to the costs or deductions incurred. The format of subparagraph (7) remains unchanged except that more examples have been added illustrating the application of subdivisions (i) through (iv). The examples have been placed under a separate subdivision (v) and categorized according to the subdivisions which they illustrate. The substance of subparagraph (7) is unchanged from the notice. However, more detailed guidance and objectivity have been added. For example, an objective 25 percent test based upon costs has been added to subdivision (ii) for purposes of determining whether an entity renders services to related parties as one of its principal activities. As in the notice, no special exception is made in subdivision (ii) for any particular type of company, such as a jointly owned "cost company."

A detailed technical memorandum is in preparation.

(Signed) Sheldon S. Cohen

Commissioner

**EXHIBITS:**
TECHNICAL MEMORANDUM re: Treasury [*4] decision--Allocation of income and deductions among taxpayers ( § 1.482-2 (b) (3) and (7)).

This memorandum concerns Treasury Decision 6998 which contains an amendment to the Income Tax Regulations (26 CFR Part 1) under section 482 of the Internal Revenue Code of 1954, relating to the allocation of income and deductions among taxpayers.

History of Development of Regulations

A proposed amendment to the regulations was first published with notice of proposed rule making in the Federal Register for April 1, 1965 (30 F.R. 4256). On August 2, 1966, the notice of April 1, 1965, was withdrawn and a new notice of proposed rule making was published in the Federal Register (31 F.R. 10394). On April 16, 1968, T.D. 6952, covering all the proposed amendments to the regulations under section 482 with the exception of § 1.482-2 (b) (7) was published in the Federal Register (33 F.R. 5848). Also on April 16, 1968, a new notice of proposed rule making was published in the Federal Register (33 F.R. 5858) with respect to § 1.482-2 (b) (3) and (7). Revenue Procedure 68-22 was issued simultaneously with the new notice of proposed rule making by issuance of T.I.R. 975. This revenue procedure [*5] provided that in examining income tax returns, making allocations, and disposing of cases for taxable years beginning prior to May 1, 1968, the Service would, when requested to do so by the taxpayer, apply the provisions of subparagraphs (3) and (7) of § 1.482-2 (b) of the proposed regulations as published in the Federal Register on August 2, 1966. Numerous written comments were received from the public and public hearings were held on June 18, 1968.

3

As a result of comments from the public, and of further comments from other offices of the Service, certain changes were made in T.D. 6998 from the notice.

The proposed amendment to the regulations under section 861, relating to sources of income, which was published in the notice of proposed rule making in the Federal Register for August 2, 1966, has not been finalized. That notice remains in proposed form.

Brief Explanation of the Provisions

Paragraph (b) (3) of § 1.482-2 of the final regulations expresses the general rule that the arm's length charge for the rendition of services to related entities is the amount which was charged or would have been charged for the same or similar services in independent transactions with [*6] or between unrelated parties under similar circumstances considering all relevant facts. In the interest of giving taxpayers the greatest assurance possible that intercompany charges will not be disturbed on subsequent audit by the Service, subparagraph (3) provides a safe-haven rule under which, with the exception of certain services, the arm's length charge for services rendered to related entities will be deemed equal to the costs or deductions incurred by the renderer with respect to such services unless the taxpayer establishes a more appropriate charge under general arm's length standards.

Paragraph (b) (7) of § 1.482-2 describes those cases in which the safe-haven cost rule may not be used. The August 2, 1966, notice described as exceptions to the safe-haven rule five specific situations which were intended to describe circumstances in which the services were considered to be part of a trade or business. Experience with this rule indicated that the exceptions to the safe-haven rule listed in the notice of August 2, 1966, were inadequate and allowed substantial income shifting in certain cases where the rendition of the services in issue was a key element in the operations [*7] of either the renderer or recipient. As a result, a new notice was published on April 16, 1968. That notice listed four different situations in which the safe-haven rule may not be used. These situations reflect circumstances in which the services rendered are considered to be an integral part of the business activity of either the entity rendering the services or the entity receiving the benefit of the services. The transmittal memorandum dated April 9, 1968, which accompanied T.D. 6952 (at pages 12-17) provides further details as to the reasons for this change. 

Detailed Discussion

§ 1.482-2 (b) (3)

Maintenance of Books and Records. In addition to a cross reference to subparagraph (7), a new provision is contained in subparagraph (3) to the effect that where costs or deductions are a factor in applying the provisions in paragraph (b) of § 1.482-2 of the regulations, the taxpayer must maintain books and records which are complete enough to allow the revenue agent to verify the costs or deductions involved. Costs or deductions are used in paragraph (b) both as a method of computing the safe-haven charge for services and as a basis for several objective tests in [*8] subparagraph (7) which determine the applicability or nonapplicability of specific subdivisions with respect to the services in issue. The use of costs or deductions in the services area benefits taxpayers by giving them additional assurance that their transactions will not be disturbed on subsequent audit. Its use is at the option of the taxpayer, not the Government. Thus, it is fair and proper to place an explicit burden on the taxpayer to maintain adequate books and records so that the figures involved may be readily

4

ascertained. This makes explicit a requirement which was already implicit in the regulations. A determination by the district director of an arm's length charge generally will not be overturned by the courts unless it can be shown to be arbitrary or unreasonable. Where a determination under these regulations of the arm's length charge for the rendition of services is based upon an analysis of costs and the taxpayer does not make available to the revenue agent books and records adequate for the computation or verification of those costs, it is neither arbitrary nor unreasonable for the district director to make his determination of the arm's length charge on general [*9] arm's length standards. It is contemplated that where taxpayers have not maintained adequate books, and records, agents may insist on application of the arm's length standard without regard to the cost safe haven.

§ 1.482-2 (b) (7)

The introductory language has been somewhat simplified. There is no substantive change in this language. Subdivisions (i) through (iv) describe those situations in which services will be considered an integral part of the business activity of a member of the controlled group. Subdivision (v) provides examples of the application of subdivisions (i) through (iv).

Subdivision (i)

This subdivision provides, in effect, that services may not be rendered at cost by utilization of the safe-haven rule where either the renderer or recipient of the services is engaged in the trade or business of rendering the same or similar services to one or more unrelated parties. The only change from the April 16, 1968, notice is that the phrase "unrelated parties" was expanded to "one or more unrelated parties" for the purpose of clarity.

The term "same services" in the notice of August 2, 1966, was changed to "same or similar services" in the notice of [*10] April 16, 1968, to eliminate the possible construction that subdivision (i) does not apply if the services rendered to unrelated parties are not identical to the services rendered to related parties. The new language better describes the situations intended to be covered. Example (1) in new subdivision (v) demonstrates the application of the principles of subdivision (i). The example illustrates a situation in which the renderer of the services renders a broader range of services to related parties than to unrelated parties. The fact pattern in the example serves to illustrate that where the renderer renders a series of interrelated services to related parties (including services not rendered to unrealted parties), the services will not be fragmentized if, when taken as a whole, they are similar to services rendered to unrelated parties as a trade or business.

Subdivision (ii)

Subdivision (ii) of § 1.482-2 (b) (7) provides, in effect, that services may not be rendered at cost by utilization of the safe-haven rule where a principal activity of the member rendering the services is the rendition of services to related parties. * In such situations, i.e., where a principal [*11] business purpose for the existence of the separate entity is to render services, it is generally appropriate to require a profit. This is especially so in two situations. The first is the case of the corporate group which maximizes its use of surtax exemptions by having the parent or another member of the corporate group render at cost a broad range of services such as warehousing, purchasing, invoicing, accounting, inventory control, etc. The second is the case where the parent of a corporate group is the only member of the controlled group located in the United States and attempts to conduct a large scale operation at cost for the

5

benefit of its foreign subsidiaries. In the first case, although one corporation is performing a major portion of the activity which generates the overall profit of the group, this profit is spread over numerous subsidiaries so as to avoid the higher surtax rate on the profit. In the latter case, the U.S. corporation may incur a substantial portion of the total costs of operations of the entire group, but the profit will all be reported outside the United States.

* The notice refers to the rendition of services to related entities. The term "entities" has been changed to "parties." The former term is used in the section 482 regulations as a word of art connoting an "organization, trade, or business," i.e., an entity to or from whom an allocation may be made under section 482. For purposes of determining whether an entity renders services to related parties as *** one of its principal activities the question of whether or not an allocation may be made to or from the recipient is irrelevant. Thus, the term "parties" has been substituted for the term "entities." [*12]

The principal activity rule additionally prevents an entity that is engaged in the trade or business of rendering services to unrelated parties from avoiding subdivision (i) by spinning off a segment of its operations to a new entity which would then render the same services exclusively to related parties. Subdivision (ii) provides greater detail and objectivity than appeared in subdivision (ii) as proposed April 16, 1968. It is now divided into subdivisions (a), (b), and (c).

1. The Principal Activity Test.

In response to comments from the public, subdivision (ii) was amended to provide further guidance as to what constitutes a principal activity. To this end, an objective test has been added. Where this test is applicable, the renderer of services will not be considered to render services to related parties as one of its principal activities if the renderer's costs attributable to the rendition of services to related parties fall below an amount equal to 25 percent of the total costs or deductions of the renderer exclusive of amounts properly reflected in the cost of goods sold of the renderer. If the total costs incurred in the rendition of services to [*13] related parties is above the 25-percent level or if the 25-percent test is not applicable, the determination of whether the rendition of services to related parties constitutes one of the principal activities of the renderer must be made on an analysis of the facts and circumstances of each particular case. Several factors are listed as exemplary of the type of analysis contemplated. They are: the time devoted to the rendition of the services, the costs incurred by the renderer in the rendition of such services (in relation to the total operating costs), the regularity with which the services are performed, the amount of investment, the risks involved, and the nature of the activity.

The decision to use the 25-percent figure was based on considerations of policy, the study of specific cases, conferences with revenue agents selected on the bases of their experience with corporations of varying size and nature, and comments of taxpayers. A large percentage was used in order to make the test of practical use to taxpayers. In adopting a high percentage, consideration was given to the function subdivision (ii) was intended to serve and the overriding policy adopted when § 1.482-2 [*14] of the regulations was first drafted. This overriding policy was and remains that services may generally be rendered at cost. In view of this overriding policy some doubt was expressed when the April 16, 1968, notice was originally drafted as to whether subdivision (ii) should even be included. Those who opposed the inclusion of subdivision (ii) felt that certain types of cost operations should be permitted under the

6

regulations. The decision to include subdivision (ii) in the notice was based on the fact that its exclusion would allow certain obvious abuses, such as the case of the corporate group which abuses the multiple surtax privilege and the case of the multimillion dollar parent shifting all the income attributable to its activities to its foreign subsidiaries. The obvious abuses typically involved cases in which the renderer devoted 100 percent of its energies to the rendition of services to related entities. With this in mind, it was decided that a percentage as high as 25 percent would rarely jeopardize our ability to exclude from the safe-haven rule those cases which subdivision (ii) was primarily intended to cover.

Another consideration was that a major portion [*15] of the cases which would be covered by a lower percentage involved situations in which the profit factor is minimal. The opinion has been expressed several times that if the regulations served to encourage taxpayers with foreign affiliates to receive reimbursement for full cost, they would be of tremendous benefit to the Government. It should also be kept in mind that application of the 25-percent test only creates a presumption that services below the 25-percent level are not "principal." Although admittedly this presumption would be difficult to rebut, this option is available in an appropriate case.

The denominator of the formula (the "total costs or deductions of the renderer") excludes amounts properly reflected in the cost of goods sold of the renderer. This exclusion is in apparent conflict with a similar formula in subdivision (iv). There are valid conceptual, as well as administrative, reasons for the difference. These reasons are discussed in detail in the explanation of subdivision (iv), infra pp. 30-33.

Consideration was also given to excluding from the denominator interest on general indebtedness. Interest on general indebtedness is an expense item which [*16] is not allocable to the cost of services as an indirect expense ( § 1.482-2 (b) (5)). It is conceivable that increased interest expense could be generated by a renderer as a device to increase its total costs or deductions in the denominator in order to bring the cost of services below 25 percent. Exclusion of the interest factor to preclude such manipulation was, however, rejected. Excluding interest expense from the denominator would have increased the verbosity and complexity of the subdivision, caused potential additional audit problems, and raised the question of whether the same exclusion should be added to the formula in subdivision (iv). Further, if the additional indebtedness is for no other purpose than to meet the 25-percent test, the Service has the traditional weapons of substance over form, sham transaction, business purpose, etc.

2. Inapplicability of 25-percent test--Nonarm's Length Transaction.

The 25-percent test, which is based on costs, is limited to situations in which the renderer has a usable cost basis for all elements of its operations. This restriction is primarily intended to exclude from application of the test individuals and those partnerships [*17] which do not have a usable cost basis for services rendered by individuals in a proprietary position. The restriction provides that where any of the costs or deductions of the renderer do not reflect arm's length consideration and no adjustment is made under any provision of the Internal Revenue Code, the 25-percent test is not applicable. However, if the effect of the variation from arm's length is not significant enough to affect the outcome of the test, the restriction is disregarded. The effect of the latter provision is that, in situations where there is no usable cost basis, the 25-percent test is applied in substance, but only after all transactions involving the renderer have been taken into consideration (for purposes of this computation) on an arm's length bawsis. *

* For example, assume partnership ABC has in its employ, aside from the partners, employees, D, E, and F and that the partners, A, B, and C do not draw a salary. Assme further that, had A, B, and C, been employed by a comparable partnership in which they were not partners (but performed the same services), they would have been paid $50,000 each. D, E, and F receive $10,000 each for their services and partnership ABC has no other expenses. If A, B, and C devote half of their time to the rendition of services to a related corporation (in their capacity as partners) and all other services performed by the partnership are rendered to unrelated parties, the cost of services to related entities would be zero and the total costs or deductions of the partnership would be $30,000 (the salaries of D, E, and F). Applying these figures to the 25-percent test, the ratio of cost of services to total costs or deductions would be 0/30 or 0 percent. By such an analysis, partners could perform an infinite amount of services for related entities and the partnership would never fail the 25-percent test. In the given example, the costs or deductions of partnership ABC do not reflect arm's length consideration with respect to the services performed by A, B, and C since an arm's length consideration for their services is $50,000 each. By making adjustments to reflect arm's length considerations it can readily be seen that the variance from arm's length does affect the outcome in this case (viz., 1/2 X [$50,000 + 50,000 + 50,000] / [$50,000 + 50,000 + 50,000 + 30,000] = $75,000 / $180,000 = 41.7%). Therefore, the 25-percent test would not apply and a facts and circumstances analysis would be required. [*18]

Since a detailed audit of each nonarm's length transaction in every case would be administratively impractical it is contemplated that the measure of the significance of the deviation from arm's length will be based upon a carefully developed estimate by the agent. A precise computation of the variance from arm's length would only be required where an estimate by the agent indicates that the percentage resulting after adjustment will be close to 25 percent. In most cases the effect of the variance will be obvious without such precise analysis.

The wording of the limitation with respect to nonarm's length transactions was carefully constructed to avoid any implication as to whether or not an allocation can be made under section 482 between an individual and his controlled entity since there is considerable disagreement as to when such an allocation can be made and whether such an allocation should be made in certain cases, particularly in the unreasonable compensation area. A literal reading of this limitation could lead to the interpretation that where there was no charge made to the renderer for services performed for it by an individual in a proprietary position the 25-percent [*19] test is applicable without adjustment since (1) all costs or deductions reported by the renderer reflect arm's length consideration and (2), in the case of the sole proprietorship and in certain partnership situations, no adjustment can be made. However, in the context of the entire subdivision (ii) (and the purpose of the 25-percent test), the only reasonable interpretation of the restricting sentence is that where the renderer's books show a zero cost for services performed for it and the arm's length value of the service performed for the renderer is above zero, such cost or deduction (zero) obviously does not reflect an arm's length consideration. Thus, in those situations in which no adjustment to arm's length can be made under any provision of the Internal Revenue Code obviously no adjustment is made and, for purposes of this computation, the costs or deductions must be considered on the basis of what they would have had an adjustment been made. The result under the former "literal" application of the restricting sentence would be patently incorrect in most cases. It is the latter interpretation which expresses the intent of the drafters. Were this [*20] issue ever to result in litigation, it is highly probable that a court would accept that interpretation

8

which gives a reasonable result in the context of the principle described as opposed to that interpretation which could give a result patently inconsistent with such principle.

The decision by the 2nd Circuit in Victor Borge, (405 F.2d 673, 69-1 USTC P9131, aff'g 26 T.C.M. 816 (1967)) upheld the right of the Service to make an allocation under section 482 between an individual and his controlled corporation where the individual is engaged in a trade or business and renders services to his controlled corporation in connection with that trade or business. In that case, Victor Borge, a professional entertainer, contracted to provide entertainment services on behalf of his controlled corporation. The taxpayer challenged the Commissioner's allocation on the basis that he did not constitute an "organization, trade, or business" as required by the statute. The court held that Borge was in the entertainment business and, thus, an allocation between the corporation and the entertainment business was proper.

In the context of the Borge case it is unimportant whether the cost [*21] of Borge's services to his entertainment business (treating Borge and his business as two separate parties for this purpose) reflects arm's length consideration. If 100 percent of Borge's entertainment services are rendered for the benefit or on behalf of his corporation then the ratio of the cost of services to the total costs or deductions of the entertainment business will be 100 percent whether it is 10 /10 or $75,000/$75,000. If Borge, in addition to rendering entertainment services to his corporation, renders entertainment services to unrelated parties he falls within subdivision (i) and any question as to the applicability of subdivision (ii) is moot. * Thus, in most eve ry case in hich an individual renders services to a controlled entity in connection with a trade or business carried on by him the safe-haven cost rule will not be applicable since: (1) if this represents 100 percent of his activity it will be covered by the 25-percent test; (2) if he also renders similar services to unrelated parties subdivision (i) will apply; and (3) if the services rendered to unrelated parties are not similar to those rendered to related parties (e.g., entertainment services [*22] and plano teaching services), it is likely that the individual is engaged in two (or more businesses and with respect to the services rendered to the controlled entity in connection with one of the businesses (e.g., the entertainment business), the cost of those services will represent 100 percent of the total costs or deductions of that business.

* Borge probably also runs afoul of subdivision (iii).

As noted previously, it is not clear how far the concept of requiring an allocation between a shareholder-employee and his controlled entity (on the basis that the employee's rendition of services to the corporation constitutes a business) can or should be extended. It should be noted that the Borge case involved the carrying on by an individual of a business separate and distinct from that business carried on by the corporation. The court in that case distinguished between devoting time and energy to a corporation "in the hope of realizing capital gain" and the rendition of services to the corporation in order to earn ordinary income.

3. Inapplicability of 25-percent Test--Manufacturing etc., Activities.

Also excluded from the 25-percent test are services which [*23] constitute a manufacturing, production, extraction, or construction activity. These services are tested independently of the 25-percent test on a facts and circumstances basis. However, they are additionally included in the 25-percent test for purposes of determining whether or not the renderer renders services in general (i.e., of all types) to related entities as one of its principal activities.

One of the reasons mentioned previously for the use of the high 25-percent figure was the assumption that a major portion of the services affected by the safe-haven rule are services of the type which would command a minimal profit. The services so contemplated are services such as bookkeeping, supervisory services, minor technical services, etc. However, manufacturing, production, extraction, and construction services are ordinarily not of such a nature. Normally, services of the latter type will command a high profit and be a key element in the operations of an entity. In the case of a large diversified corporation, the costs of such services may often represent less than 25 percent of its "total costs." For this reason, these services were specifically excluded from the 25-percent [*24] test.

An additional reason why these services have been singled out is to prevent a complete manufacturing function from being classified as a service function merely by having the manufacturing entity place title to its raw materials in the hands of an affiliate and thereby having the affiliate become the recipient of manufacturing services. The best example of this is the case in which an entity is performing contract manufacturing services where the identical activity would be classified as a sale if the title to the raw materials were held by the "renderer" rather than the "recipient." This may often develop into a substance over form argument. However, where the activities are nearly identical, the rules applicable for determining an arm's length charge should be substantially the same. Singling out these four specific types of services provides for this result. A number of examples have been added illustrating the application of this exception to the 25-percent test.

Some consideration was given to excluding selling services from the application of the 25 percent. However, due to the additional complexities such a provision would add, particularly in connection with [*25] definitional problems, it was decided that exclusion was not warranted. An example of the definitional problems is the question of whether advertising is a selling service and, if so, what constitutes advertising?

4. "Cost Companies"

It was noted in the transmittal memorandum accompanying T.D. 6952, dated April 9, 1968, that subdivision (ii) as proposed, would often permit the district director to require a profit to be reported by the so-called "cost companies", i.e., companies operating at cost and owned jointly by two or more unrelated parties. That memorandum stated, at page 16,

An argument can be made (the entity theory notwithstanding) that many of these companies are in fact joint ventures or cost-sharing arrangements and as such should not be forced to show a profit. This is apparently the theory which justifies the Service's position on captive mining companies in Rev. Rul. 56-542, C.B. 1956-2, 327, and which could be extended to cover joint newspaper publishing facilities and similar situations as well. Recognizing the possible conflict between subdivision (ii) and Rev. Rul. 56-542, it is contemplated that any conflict will be resolved before the new proposed [*26] (b) (7) regulations are finalized. This will probably be accomplished either by a change in the final regulations or by the issuance of a revenue procedure or revenue ruling.

After a series of meetings within the Service and after meetings with the American Iron Ore Association, representing the group principally concerned over this apparent conflict, it was determined that this problem would be resolved outside of the regulations. There is some question as to the effect, if any, of the regulations upon the "captive mining companies" sanctioned by Rev. Rul. 56-542. The doubt centers around

10

the nature of the services rendered, who is the renderer of the services, and the appropriate arm's length charge. A copy of a memorandum containing more detail on this subject from this office to the office of the Assistant Commissioner (Technical) is attached. 

In areas other than captive mining companies, the most likely tax effect of the allocation of income to the "cost company" would be the possibility of an additional $25,000 of income being exempted from the surtax. In light of our general policy to refrain from applying section 482 where there is no substantial tax benefit to the [*27] Government, it is unlikely that the regulations will have any real effect on these operations. In any case in which use of a jointly owned "cost company" causes a substantial tax difference (which is most likely to occur in cases involving loss corporations, foreign corporations, or special status corporations, such as Western Hemisphere Trade Corporations) a departure from the entity theory in such a case is inappropriate and section 482 should generally be applied.

5. The "Consolidated Group" Rule.

Subdivision (ii), as proposed on April 16, 1968, also affected the right of a group of related entities to operate a separate "technical services" corporation at cost. Such a corporation typically renders merely administrative and office services such as bookkeeping, mail and messenger services, communication, travel, and other similar support activities. Where this type of corporation operates at cost, usually no tax is avoided if the recipients of the services are domestic entities. If, however, the service corporation renders services to foreign affiliates, loss corporations, or United States corporations enjoying a special tax status (such as Western Hemisphere Trade Corporations), [*28] any profit which may be attributable to those services is shifted to the recipient corporation and may escape U.S. taxes altogether or be taxed at a lower rate than if the rendering corporation had reported the profit. Often, a large corporate group with international operations will have a domestic "technical services" corporation based in a foreign country rendering services to the foreign members of the controlled group. It is our understanding that a number of corporate groups have negotiated agreements with the foreign countries in which their "technical services" corporation is based whereby the foreign country agrees to refrain from imposing a tax on the payments for services rendered to related foreign entities and additionally agrees not to classify the "technical services" corporation as a permanent establishment of the U.S. parent corporation. These agreements are subject to the condition that the charges made by the service corporation be at cost only and that the agency rendering the services be separately incorporated in order to facilitate the accounting for such costs. Application of section 482 in this situation could conceivably result in upsetting these agreements. [*29] Taxpayers affected by this noted that if these same "technical services" were rendered by a division of the parent corporation instead of by its subsidiary, the services rendered would not be a principal activity of the parent as defined in subdivision (ii). If the parent and subsidiary file a consolidated return they are taxed essentially as if the two entities were one taxable unit. Therefore, in the interest of avoiding disruption of normal business practices, the regulations provide that services may be rendered at cost where, had the parent and subsidiary been one, the rendition of the services at cost would have been sanctioned (under the regulations). To this end, (c) of subdivision (ii) has been added. This subdivision (c) provides that, at the option of the taxpayer, the operations of a consolidated group will be considered in the aggregate to determine whether services rendered by a member of the consolidated group to another related entity outside the consolidated group constitute one of the principal activities of the renderer. In this case, the entire consolidated group is treated as the renderer. However, this "consolidated group" rule is applicable [*30] only for purposes of the 25-percent test.

11

Thus, if the 25-percent test is not met, the facts and circumstances test in (a) of subdivision (ii) is applied on an entity by entity basis.

The consolidated group is defined as all members of a group of controlled entities created or organized within a single country and subjected to an income tax by such country on the basis of their combined income. It was felt that limiting the definition to those corporations filing a U.S. consolidated return would, on its face, work in a discriminatory manner by disallowing comparable treatment to foreign corporate groups following a tax reporting concept similar to the U.S. consolidated return concept.

It should be noted that this rule does not apply to services rendered by one member of the consolidated group to another member of the consolidated group. Treatment of the entire group as one entity is inappropriate for purposes of measuring transactions between members of that group. Generally, the question of whether a profit should be charged between two members of a consolidated group will be academic since the resulting income and expense items will offset each other on the consolidated [*31] return. Differentiating between related entities within the consolidated group and related entites outside the consolidated group may cause the anomalous result of allowing a charge of cost on the rendition of services to a foreign entity and requiring a profit on the rendition of identical services to a domestic entity. The alternatives would be either to allow all service transactions within the consolidated group to be rendered at cost (which may also cause an anomalous result where a profit is required on the rendition of the identical services to a foreign entity) or to incorporate transactions between members of the consolidated group in the rule. The latter alternative, i.e., incorporation in the rule, is conceptually weak since it would entail treating both the renderer and the recipient as the renderer. The alternative of allowing all such transactions at cost is unacceptable since shifting of income between members of a consolidated group may have a substantial tax effect in certain cases. In short, the potentially different results of applying section 482 transactions between a member of the consolidated group and a related entity outside the consolidated group [*32] is justified since the analysis by which the consolidated group is treated as one entity breaks down when applied to transactions within the one group.

6. Application of the "Consolidated Group" Rule -- Services in Connection with the Transfer of Property.

Some complications are created by use of the "consolidated group" rule. Subparagraph (8) of § 1.482-2 (b) provides that when property is transferred between two controlled entities and services are rendered by the transferor in connection with the transfer, the amount of any allocation shall be determined in accordance with the rules in paragraph (c), (d), or (e), whichever is appropriate, and no separate allocation with respect to the services shall be made. For example, were X to render warranty services to Y in connection with the sale of property to Y by X, no separate allocation for those services would be made under paragraph (b) of § 1.482-2. Rather, the value of those services would be considered in making an allocation to reflect an arm's length sales price of the property under paragraph (e) of § 1.482-2. Conceivably, the transferor of the property and the renderer of the services could be two separate [*33] parties. For instance, rather than X rendering warranty services to Y, Z, another related entity, could have rendered those services (possibly at cost under paragraph (b)). Although this potential existed before the "consolidated group" rule was created, the potential is increased by the addition of this rule since it allows greater flexibility in the rendition of services to foreign affiliates at cost. After attempting several drafts to resolve this problem, it was decided that it was not significant enough to warrant the increased complexity it would add to the regulations.

12

The problem may be resolved within the context of the existing regulations under one of two approaches. First, the regulations ( § 1.482-2 (b) (8)) refer to "services rendered by the transferor". It may be argued that where the transferor (X) and the entity actually rendering the services (Z) are part of a consolidated group and, under subdivision (ii) (c) of § 1.482-2 (b) (7), the consolidated group is considered the renderer, the transferor, as part of the group, is rendering the services for purposes of subparagraph (8). Hence, with X and Z, in the aggregate, being considered the renderer, it is [*34] appropriate to consider X as both the transferor and the renderer for purposes of subparagraph (8) of § 1.482-2 (b). Additionally, it may be argued in appropriate cases that, where the rendition of the services in connection with the transfer has enhanced the value of the property transferred, or facilitated the transfer, the services were rendered for the benefit of or on behalf of the transferor who, in turn, rendered them to the transferee. Both these approaches leave to be resolved (1) the appropriate allocation between the entity initially rendering the services (Z) and the transferor (X) and (2) how much to allocate (and the effect of repatriation) where the transferee (Y) has paid a service fee to the entity initially rendering the services (Z).

7. Application of the "Consolidated Group" Rule -- "Trade or Business" Services.

The addition of the "consolidated group" approach could allow an entity engaged in the trade or business of rendering services to unrelated entities to spin off a portion of its operations into another corporation (and, thus, avoid subdivision (i)) as long as the spun-off corporation was part of a large enough consolidated group. To deal with [*35] this potential a sentence was added to (c) of subdivision (ii) precluding the utilization of (c) with respect to services of a type which any member of the consolidated group renders to unrelated parties. Thus, the 25-percent test is applied on an entity by entity basis with respect to such services. The cost of such services, however, is included in the 25-percent test to determine whether the safe haven rule is available with respect to other services rendered to related entities if the taxpayer chooses to use the consolidated group rule.

8. Application of the "Consolidated Group" Rule -- "Double Deductions."

Another problem potentially created by the "consolidated group" rule was that a consolidated group could artificially build up the total costs or deductions of the group (for purposes of the 25-percent test) through intercompany transactions. For example, assume Z, a member of a consolidated group, needed a particular machine in its operations. Instead of buying the machine outright and, thus, having the depreciation of the machine as an operating cost of the group, X, another member of the group could buy the machine and rent it to Z. This would result in [*36] treating both Z's rent expense and X's depreciation expense as part of the operating costs of the group. In fact, this "double deduction" of sorts usually occurs when there is a transaction between two members of a consolidated group. To correct this, subdivision (c) provides for the elimination of intercompany charges. This has the effect of treating transactions between members of the consolidated group like transactions between divisions within a single corporation which, of course, is the proper result under the "consolidated group" rule.

Using the elimination of intercompany charges as a means to prevent "double deductions" allows for the situation in which Z in the above example buys the machine from X. In such a case, the depreciation on the machine will be included in the total costs or deductions of the group since the depreciation is not an intercompany charge. This, of course, is the proper result since there is no doubling up of deductions in such

13

a transaction.

9. Unresolved Problems Created by the "Consolidated Group" Rule.

There are other difficulties created by the addition of subdivision (c) which have not been resolved in the regulations. [*37] Perhaps the most important of these is the fact that this approach might suggest the argument that the consolidated concept should be extended to other parts of the section 482 regulations. The answer is simply that this approach was added as a practical solution for the limited purpose of correcting a potential inequity. This potential inequity was brought about by one subdivision within a rule and that rule, itself, is an exception to the general rule. Whereas it is appropriate for this limited purpose, further extention of this concept would not be proper. Consideration was given to adopting a broader rule which would have treated all members of the controlled group created or organized within a single country as the renderer (whether or not they were taxed on combined income). This was rejected, however, because it is the policy throughout the section 482 regulations to treat taxpayers similarly situated alike without regard to whether or not international operations are involved.

Whereas the justification for the addition of subdivision (c) was based on the "technical services" corporations, it is equally applicable to all services and may facilitate, for instance, [*38] the transfer at cost of management services and research and development services. It should be noted, however, that any transfer of services is additionally subject to subdivisions (i), (iii), and (iv). This new addition merely provides for the use of a separate corporation for the rendition of services that normally could be rendered by the parent corporation at cost without the application of subdivision (c). Again, although admittedly difficult to rebut, the 25-percent test is a presumption and, in extreme cases, may be rebutted.

In the case of research and development services, if the services result in the transfer of intangible property, the transaction is subject to the rules with respect to the transfer of use of intangible property ( § 1.482-2 (d)). Often research and development services, as well as management services, may involve the utilization of intangible property by the renderer. In such cases, subdivision (iii) will generally be applicable. In other cases the utilization of previously developed intangible property will be so predominate that the substance of the transaction will amount to the transfer of the previously developed property.

Some concern [*39] has been expressed that the services rules will be used to circumvent the need for a bona fide cost-sharing plan (as defined in § 1.482-2 (d) (4)). The bona fide cost-sharing plan provision in the regulations is intended as an aid to taxpayers and is available at their option. Since compliance with paragraph (d) (4) of § 1.482-2 will give taxpayers the greatest assurance that their arrangement will not be disturbed on subsequent audit, it is unlikely that a taxpayer will try to "circumvent" the cost sharing provision. The suggestion was made that a few taxpayers may avoid use of the cost-sharing provision in an attempt to conceal the fact that previously developed intangible property was used in the development of additional intangible property and, for this reason, research services should be specifically excluded from the services portion of the regulations. It is no more difficult, however, to conceal the use of previously developed intangible property under the cost-sharing provision than to do so under the services rules. The practical burden of the Service in uncovering such deception is the same in either case. If research services were excluded from the services rule [*40] (a position which would be difficult to justify), parties could enter into arrangements for the development of intangible property without strict compliance with such a cost-sharing provision in the regulations as long as the terms of the

14

arrangement were arm's length. Such an arrangement would be in compliance with the statute and, thus, would override any provision in the regulations to the contrary. Further, where two or more parties are jointly engaged in the development of intangible property, each as a developer (as opposed to one being an assister), activities engaged in by any one of the parties in their capacity as a developer are not services rendered by one party on behalf of or for the benefit of another party as contemplated in paragraph (b). Rather they are services rendered for the benefit of the renderer which collaterally benefit the other party or parties to the plan. Whether a party is a joint developer or an assister will be a question of fact. Guidance on this subject is provided in § 1.482-2 (d) (1) (ii) (c). Where a party is an assister and receives an interest in the intangible property developed, there has been a transfer within the meaning of § [*41] 1.482-2 (d).

The addition of subdivision (c) may subject the Service to the charge that it is discriminating against corporations not filing consolidated returns. For example, a multimillion dollar consolidated group may have a separately incorporated business, acquired as a going concern, performing services for the benefit of its related entities (outside the consolidated group). A member of another group of controlled corporations may perform identical services for its related entities and not be part of a consolidated group. Under the "consolidated group" rule, the former corporation, by application of the 25-percent test, may be able to render those services at cost whereas the latter corporation will be required to report a profit. This result can be justified on the basis that, in the case of the consolidated group, we are looking at one portion of the operations of a group essentially taxed as one unit, whereas in the latter case, the activity in issue constitutes the entire operations of that entity. Where the nonconsolidated corporation may elect to become part of a consolidated group the problem is lessened. It is probable that in those instances where the nonconsolidated [*42] corporation cannot become part of a consolidated group the rationale for application of the rule (i.e., the service corporation could be merged into its parent) will fail and the difference in treatment of the two corporations is justified. Additionally, elimination of the "consolidated group" rule would mean that a multimillion dollar corporation with a "technical services" division could render technical services at cost, but a comparable corporation with a separate, wholly owned "technical services" corporation (separately incorporated for valid nontax reasons) filing a consolidated return with the parent would be required to report a profit on identical services. Thus, wherever the line is drawn, some potentially dissimilar treatment will result. The consolidated group rule produces the most equitable result feasible.

Subdivision (iii)

This subdivision provides, in effect, that services may not be transferred at cost by utilization of the safe-haven rule where the renderer is peculiarly capable of rendering the services because they are of such a nature that they are not generally available elsewhere and, although not necessarily substantial in terms of the total [*43] activities of an entity, are a key factor in determining the success or failure of a particular profit making activity (and, thus, are a principal element in the operations of the recipient).

In response to comments from taxpayers, greater specificity has been added to this subdivision. The subdivision now describes three particularly advantageous situations or circumstances which, if availed of by the renderer in connection with the rendition of the services, will cause the renderer to be classified as "peculiarly capable" of rendering the services. These three situations or circumstances cover those areas in which it is contemplated that subdivision (iii) will most frequently come into play. They

15

are not, however, all inclusive and this subdivision may be applicable to a situation or circumstance not specifically described therein.

1. Special Skills and Reputation.

The first particularly advantageous situation or circumstance described is the utilization by the renderer of special skills and reputation in connection with the rendition of the services in issue. The conjunctive is used to indicate that the possession of neither special skills alone nor reputation alone [*44] is sufficient to classify the renderer as "peculiarly capable". This is the one situation or circumstance of the three specified with respect to which there has been greatest difficulty. This is intended to cover situations in which an individual or group of individuals, because of the possession of a special skill or talent, enjoys an outstanding reputation causing his (or their) services to command a premium. This would include an individual in the entertainment field, such as Victor Borge (see Victor Borge, supra, p.11). There is some feeling that a special rule in this situation is unwarranted since such an individual (or group of individuals), in the employ of an organization, trade, or business would command a salary which reflects the exceptional value of his (or their) services. Thus, when the organization, trade, or business renders the services of such employees to a related entity the costs incurred by the rendering entity is a fair reflection of the value of these services. Those who believe this rule is unnecessary further feel that when the individual performing the services is in a proprietary position and the entity employing him does not pay him a salary [*45] commensurate with his value, an allocation for such a salary under section 482 will normally be appropriate. This is premised on the conclusion that (1) an allocation can be made between an individual and an entity owned or controlled by such individual and (2) the services are such that one of the subdivisions in this subparagraph would apply without the use of a special rule in this subdivision.

As noted previously, there is some controversy as to when an allocation under section 482 can or should be made to or from an individual. It has been held, however, that where an individual is engaged in a separate trade or business an allocation may be appropriate (Pauline Ach, 42 T.C. 114 (1964), affirmed 358 F.2d 342 (1966), cert. denied 385 U.S. 899 (1966), (an allocation to a dress business owned as a sole proprietorship); Victor Borge, supra, p. 11 (allocation to an entertainer)). Inclusion of this situation here precludes the necessity of making two allocations, i.e., first between the individual and, for example, his corporation and then between two related corporations. Additionally, this protects the Government in cases in which an allocation to an individual [*46] is improper. Although the recent Court of Appeals decision in the Victor Borge case has added to the authority for an allocation between an individual and his controlled corporation, that decision noted that the individual was in a business which was separate and distinct from that of his corporation. The propriety of an allocation between an individual and his controlled corporation where the individual manages the business of the corporation is still in question although the opinion in the Victor Borge case can be read to lend support to such an allocation.

2. Influential Relationship.

The second particularly advantageous situation or circumstance covered in subdivision (iii) is the utilization by the renderer of an influential relationship with customers in connection with the rendition of the services in issue. An example of this is the selling services provided by certain automobile finance companies to their captive credit life insurance companies (See Local Finance v. Commissioner, 48 T.C. 773 (1967), aff'd 407 F. 2d 629 (CA-7, 1969), petition for cert. filed, September 5, 1969, 38 U.S. Law Week 3089, and example (10) in subdivision (v)). A great deal [*47] of difficulty was

encountered in arriving at words precise enough to cover this type of situation to the exclusion of the normal customer-vender relationship. Although the phrase "influential relationship" alone is insufficient for this purpose, it is sufficiently precise when combined with: the introductory language "particularly advantageous", a later test in the subdivision of value substantially in excess of cost, and examples demonstrating what is intended to be covered and what is not intended to be covered.

3. Utilization of Intangible Property.

The final particularly advantageous situation or circumstance covered in this subdivision is the utilization by the renderer of its intangible property in connection with the rendition of the services in issue. A cross reference to paragraph (d) (3) of § 1.482-2 is included for the broad definition of intangible property found therein. This is intended as the complement of paragraph (d) of § 1.482-2 in that it covers those situations in which the recipient of services, by virtue of the rendition of the services, enjoys the value of certain intangible property possessed by the renderer although the property or an interest [*48] therein is not transferred to the recipient within the meaning of paragraph (d). A number of comments from the public expressed concern that this subdivision would be used by agents to upset bona fide plans for the development of intangible property based on a sharing of the costs and risk of development (see paragraph (d) (4) of § 1.482-2). This fear stemmed from example (4) of the proposed regulations which has been replaced by more explicit examples. In example (4) of the proposed regulations the renderer makes use of a secret process it possesses in developing a product for the recipient. Although this example was technically correct, it has been eliminated since it is not clear that intangible property was not transferred under those facts and because the argument was made that it could have been used by agents as a basis for upsetting valid cost-sharing plans for the development of intangible property. Three new examples (examples (11), (12), and (13)) have been added in its place which more clearly demonstrate the situation intended to be covered. Since subdivision (iii) is not applicable where the recipient owns the requisite interest in the intangible property as the [*49] result of a bona fide cost-sharing plan, whenever the issue of utilization of intangible property arises during an audit, the agent should ascertain whether a cost-sharing plan is in existence. It is anticipated that agents will be so instructed.

4. Value Substantially in Excess of Cost.

In addition to the delineation of particularly advantageous situations or circumstances, a further limiting factor has been added to subdivision (iii). The final sentence of this subdivision provides that the renderer of the services will not be considered "peculiarly capable" unless the value of the services is substantially in excess of the costs incurred by the renderer in rendering the services. This additional restriction on the application of subdivision (iii) makes the subdivision conceptually complete. The peculiar capability intended to be covered in this subdivision is a capability of such a nature that cost is not a relevant measure of its value. Although subdivision (iii) would be more objective on its face without this addition, this additional subjectivity can only work to the taxpayer's advantage since it serves to eliminate from the subdivision services which would otherwise, [*50] on their face, be included under the other tests provided therein. This, of course, would eliminate services involving special skills and reputation where the compensation paid to the individual or individuals performing the services reflects the exceptional value of their services.

A weakness in the value in excess of cost test is that it requires a computation of the "value" of the services in order to determine whether an allocation reflecting value is necessary. In addition, this test adds the old problem of determining the meaning of

17

the phrase "substantially in excess". It was generally agreed that a value of 200 percent in excess of cost is substantial while a value of 20 percent in excess of cost is not substantial. It was further agreed, however, that no one figure can be prescribed for this purpose. Although further certainty could be added by an objective test for "substantially in excess" the nature of the subdivision does not lend itself to such precision. In addition, a precise figure (e.g. 50 percent) would require a precise valuation of the services leading to collateral and unnecessarily complex issues. It is believed that a vast majority of cases will [*51] fall clearly on one side or the other side of "substantially in excess" without the need for precise valuation.

Subdivision (iv)

This subdivision describes cases in which the recipient of the services has received the benefit of a substantial amount of services from related entities during the taxable year. It is intended to cover cases in which such a significant portion of the activities of the recipient represents services rendered to it by related entities that it is appropriate to reflect in the income of those related entities at least a portion of the income resulting from the activities of the recipient. The so-called paper company, in which virtually all the activities result from services rendered to the company by related entities, represents one type of case covered by this subdivision.

Subdivision (iv) includes an objective 25 percent-test of substantiality. The test is based on the relationship of the costs incurred by related parties in the rendition of services to the recipient during its taxable year to the total costs incurred by the recipient during the taxable year. For this purpose, the total costs incurred by the recipient is modified by including [*52] in the total cost the costs incurred by related entities in rendering services to the recipient and excluding amounts paid or accrued to related entities for such services and also excluding amounts paid or accrued for materials the cost of which is properly reflected in the cost of goods sold of the recipient. As pointed out in comments from the public, this objective test based on costs for one taxable year can cause inequitable results in certain cases. This may occur in the case of the inception of operations or the addition of operations or in the case of other unusual circumstances of a nonrecurring nature which cause the total costs or deductions of the recipient to be deflated for the taxable year in issue. To alleviate potential inequities of this nature the test in the final regulations allows a taxpayer the option of using costs incurred over a 3-year period ending with the close of the taxable year in which the services in issue were rendered (or the first 3 years of operations if the recipient had been in existence for less than 3 years when the services in issue were rendered) where total costs are abnormally low due to an unusual event of a nonrecurring nature. [*53]

Differences in Cost Factors Between Subdivision (ii) and (iv)

As noted previously, there is an apparent inconsistency between the 25-percent test in subdivision (ii) and the 25-percent test in subdivision (iv). Both tests deal with the relationship of the cost of services in issue to the "total costs" of the renderer or recipient. The apparent inconsistency lies in the fact that while the numerator in both formulas involve the cost of services rendered, the denominator in subdivision (ii) excludes from "total costs" (of the renderer) amounts properly reflected in the cost of goods sold whereas the denominator in subdivision (iv) excludes from "total costs" (of the recipient) only the materials portion of the cost of goods sold (there are additional adjustments to the denominator in the subdivision (iv) test, but they are not pertinent to this discussion). Although obviously there is a difference in the two approaches there is no inconsistency since the difference is justified on both practical and conceptual bases.

18

The concept of the rendition of services as a principal activity (subdivision (ii)) and the concept of the receipt of a substantial amount of services (subdivision [*54] (iv)) are similar, but they are not identical. Because of the distinction different objective tests are used in the two subdivisions. Subdivision (iv) looks to the activities of the recipient, in total, to determine whether a substantial amount of effort behind that total was provided by related parties. Subdivision (ii) looks at the various activities of the renderer to determine whether one particular activity, i.e., the rendition of services to related entities may be appropriately considered one of the principal activites of the renderer.

Subdivision (ii), then, is concerned with situations in which one of the principal activities of the renderer is the rendition of services to related parties. If one of the activites of the renderer entails the sale of goods all amounts properly reflected in the cost of goods sold will be directly related to such manufacturing and/or selling activity. In most cases, this will be the principal activity of the renderer. The remaining "other deductions" represent amounts which are either in support of or unrelated to the manufacturing/selling activity. Since amounts reflected in the cost of goods sold are directly related [*55] to the manufacturing/selling activity of the renderer, those amounts are isolated and the costs or deductions which are not directly related to such activity are analyzed to determine if a substantial amount of those costs or deductions are applied to the rendition of services to related parties. If a substantial amount of the "other deductions" are for the rendition of services to related parties such activity will be considered one of the principal activites of the renderer.

In other words, the manufacturing/selling activity is presumed to be one of the principal activities of the renderer. This activity, therefore, is isolated from the other activities of the renderer. If a substantial portion of those remaining activities involve the rendition of services to related parties, this will be considered one of the principal activities of the renderer.

Isolation of the cost of goods sold is necessary in subdivision (ii) for two reasons. First, inclusion of the cost of goods sold (even without the cost of materials) would mean that any large manufacturer would be virtually exempt from the 25-percent test since the labor and overhead costs will generally exceed the "other [*56] deductions" by at least threefold. Hence, even if all other deductions were related to the rendition of services to related parties such activity would not be considered one of the principal activities of the renderer were cost of goods sold included in the denominator. Secondly, whereas the costs of labor and overhead may serve as a measure of the time and effort devoted to various activities, the costs of materials normally will not be a reliable measure of the time and effort factors. A formula which encompasses the relationship between the cost of materials and the costs of labor and overhead would not be a reliable measure of substantiality in terms of time and effort.

An additional problem results from an attempt to exclude only the cost of materials element of cost of goods sold in subdivision (ii). In cases involving a consolidated group, wherein a large number of corporations, in the aggregate, may be considered the renderer, the administrative burden involved in segregating the cost of materials would be great. Therefore, aside from the more important conceptual basis for eliminating cost of goods sold in subdivision (ii), there is a practical necessity for [*57] doing so.

Although it is reasonable to isolate and exclude the primary activity of the renderer (i.e., by eliminating the cost of goods sold) to determine whether the rendition of services to related parties is one of the principal activities of the renderer, such an

approach is not feasible with respect to the test in subdivision (iv). That test is concerned with the substantiality of services received from related parties in relation to the total activities of the recipient. Thus, where subdivision (iv) is concerned with the situation in which the amount of activity performed by related parties is so substantial that the ability of the recipient to independently generate income is often in question, subdivision (ii) is not concerned with the independent viability of the renderer.

The meaningfulness of the test in subdivision (iv) would be substantially weakened if the labor and overhead elements of cost of goods sold were eliminated since the most typical example of the type of company intended to be covered in that subdivision is the company which acts as the "superdistributor" of the products of its parent company. In the case of the "superdistributor" most [*58] of the costs of operations will be in the cost of goods sold and all or a major portion of those costs will represent services performed by the parent. Furthermore, if the recipient actually does perform functions in connection with the product, such as packaging, assembly, etc., it would be inequitable to exclude the resulting costs from the formula.

Taxable Year of the Recipient

Subdivision (iv) refers to costs or deductions related to the rendition of services during the taxable year of the recipient. Obviously, in order to apply objective standards to the principles expressed in subdivision (iv) it is necessary to confine the elements used (i.e., costs or deductions) to a specific time period. Practicality dictates that the time period used be the taxable year of the recipient.

There are two conflicting viewpoints as to the significance of the restriction to the taxable year of the recipient. One theory is that the restriction is merely a restriction with respect to which services are subject to the objective test, i.e., those services rendered during the taxable year, and that all costs or deductions related to those services, whether or not incurred [*59] during the taxable year, would be included in the test. Under this theory, if X agreed to undertake a market study for Y in year 1 and the results of the study were presented to Y in year 2, year 2 would be the year in which the services were "rendered" for purposes of the regulations. Thus, if X spent $50,000 on the study in year 1 and $50,000 on the study in year 2, the proper cost of services rendered would be $0 in year 1 and $100,000 in year 2. The result of this approach (in some cases) will be that there will not be a matching of income and deductions. That is, the renderer will have deductions in one year without the offsetting income and will have income in a subsequent year not fully offset by deductions. One of the rationales behind the cost safe-haven is that the recipient of the services could have employed the persons or facilities rendering the services and, therefore, no profit should be imputed. Consistent with this rationale, the recipient should incur the costs at the same time the renderer incurred them. The alternative theory is that the term "during the taxable year" restricts the test to costs or deductions incurred during the taxable year for services [*60] rendered during that same period. Applying this latter viewpoint to the above example, X rendered services for Y in both year 1 and year 2 and, hence, the cost of services in year 2 would be $50,000, the other $50,000 being cost of services in year 1.

These two conflicting theories have broader application than simply the objective test of subdivision (iv). They will come into consideration any place in the regulations in which the cost of services is a factor. The most important area being with respect to what allocation is to be made when the safe haven rule applies so that the arm's length charge for services is deemed equal to the costs or deductions related to the rendition of the services.

The fundamental concept on which the disagreement is based is whether costs can be incurred in one year and be related to services rendered in another year. Thus, in the case of the market study, supra, physical activities were engaged in by X in year 1 which were intended for the benefit of Y. Can it be said that services were not "rendered" for Y's benefit until the study was presented to Y in year 2? Certainly, it is not unusual business practice in such a situation for the [*61] renderer to defer any charge to the recipient until the recipient receives the benefit, i.e., the study. The resolution of the problem posed in the example may hinge on whether Y would have had to reimburse X for X's costs if the study were never completed. However, if the answer is in the negative, the transaction is more likely to be classified as a contract for the transfer of intangible property, i.e., the market study, than as a contract for the performance of services. Had X performed the market study for itself in year 1 and transferred the results of the study to Y in year 2, no part of the costs incurred by X in year 1 could be included in the cost of services rendered to Y for purposes of applying the subdivision (iv) formula in year 1.

Put in the context of the safe haven allocation, the latter theory (restriction to costs incurred during the taxable year) would mean that, when the safe haven rule applies, an allocation of deductions (from the various renderers to the recipient) results. Under the former theory, a safe haven allocation would be of income based on the cost incurred. Thus, if, in an arm's length transaction, a charge for the services would [*62] have been made in year 2, the safe haven rule would dictate that an arm's length charge would be deemed equal to all costs or deductions incurred with respect to the services regardless of the years in which they are incurred. Query--would the allocation of deductions theory require, in the example, that if the safe haven were not applied a charge would only be made in year 2, but if the taxpayer elected the safe haven route (assuming he could) two charges would result - one in year 1 and one in year 2?

It should be noted that the denominators of the fractions in subdivisions (ii) and (iv) are made up (in part) of "the total costs or deductions * * * [for the] * * * taxable year." Thus, if the costs of services are not restricted to costs incurred during the taxable year a comparison of the cost of activities occurring in more than one year (the numerator) to the cost of activities occurring only in one year (the denominator) will result. Additionally, many of the services involved will be of the type which are difficult to isolate and attribute to a particular entity. They will be allocated on some general basis, such as sales, gross income, etc. Hence, from an administrative [*63] viewpoint, it will generally be more practical to analyze costs year by year than to accumulate costs on a project basis over one or more years and make a single allocation.

Subdivision (v)

The examples at the end of subparagraph (7) which demonstrate the application of subdivisions (i) - (iv) have been changed considerably. These changes are mainly to conform the examples to the changes made in the subdivisions and to add new examples to illustrate additional principles.

# Exhibit B



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

SMALL BUSINESS/SELF-EMPLOYED DIVISION

JUN 0 4 2007

Ms. Carol Gruenburg
Miller & Chevalier
655 Fifteenth Street, NW, Suite 900
Washington, DC 20005-5701

Dear Ms. Gruenburg:

This is in response to your Freedom of Information (FOIA) Act request dated April 6, 2005 and received in our office on April 8, 2005 (copy enclosed).

We have been advised by the Chief, Disclosure & Litigation Support Branch that the requested information relating to a transmittal memorandum dated April 9, 1968 (29 pages) which accompanied T.D. 6952 is being withheld in their entirety, pursuant to the Freedom of Information Act 5 U.S.C. 552, in accordance with subsection (b)(5).

Subsection (b)(5) of the Freedom of Information Act exempts from disclosure inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency. The three primary privileges covered by this exemption are the deliberative process privilege, the attorney work product privilege and the attorney-client privilege.

The deliberative process privilege protects documents which reflect advisory opinions, recommendations, and deliberations comprising the process by which decisions and policies are formulated. The attorney work product privilege protects memorandums prepared by an attorney in contemplation of litigation which sets forth the attorney's theory of the case and litigation strategy.

The attorney-client privilege protects confidential communications between an attorney and a client relating to a legal matter for which the client has sought professional advice.

You also requested a copy of a memorandum containing more detail on this subject from this office to the office of the Assistant Commissioner (Technical), which was originally attached to the transmittal memorandum for T.D. 6998. A search was conducted by the Chief, Disclosure Litigation Support Branch and they were unable to locate the document specifically responsive to your request.

Page 2.
Ms. Gruenburg

Notice 393, which describes the exemption and provides information concerning appeal rights, is enclosed

Should have any questions regarding this correspondence, you may contact Senior Disclosure Specialist, Sharon E. Baker, ID #50-00267, by calling (202) 238-0308 or by writing to: Internal Revenue Service, Baltimore Disclosure Office, SE:S:CLD:GLD:D3-FOIA, George Fallon Fed. Bldg., Room 940, 9th Floor, 31 Hopkins Plaza, Baltimore, MD 21201. Please refer to case number: 20-2005-01690.

Sincerely,

Joan D. McClean
Disclosure Manager
ID# 52-00489
Baltimore Disclosure Office

Enclosures

### Information on an IRS Determination to Withhold Records Exempt From The Freedom of Information Act – 5 U.S.C. 552

#### Appeal Rights

You may file an appeal with the Internal Revenue Service (IRS) within 35 days after we (1) deny you access to a record in whole or in part; (2) have made an adverse determination as to your category as a requester; (3) deny your request for a fee waiver or reduction; or (4) have advised you that no records responsive to your request exist. You may file an appeal within 10 days when a request for expedited processing has been denied.

Your appeal **must** be in writing, must be signed by you, and must contain:

>Your name and address,
>Description of the requested records,
>Date of the request (and a copy, if possible),
>Identity of the office and contact on the response letter, and
>Date of the letter denying the request (and a copy, if possible)

Mail your appeal to:

>IRS Appeals
>Attention: FOIA Appeals
>5045 E. Butler Ave.
>M/Stop 55201
>Fresno, California 93727-5136

#### Judicial Review

If we deny your appeal, or do not address an issue raised in your appeal within 20 days (excluding Saturdays, Sundays, or legal public holidays) after the date we receive your appeal, you may file a complaint in United States District Court in the district in which (1) you reside; (2) your principal place of business is located; (3) the records are located; or (4) the District of Columbia. A complaint may be filed within 10 days (excluding Saturdays, Sundays, or legal public holidays) after the date we receive your appeal if your appeal is from an adverse determination of a request for expedited processing. If you choose to file suit before receipt of a final determination by the Appeals office, the administrative appeals process may cease.

The rule for effecting service of judicial process upon the Internal Revenue Service is set forth in Federal Rule of Civil Procedure 4(i). In addition to service upon the United States, as set forth in Rule 4(i)(1), service must be made upon the Internal Revenue Service by registered or certified mail as set forth in Rule 4(i)(2)(A). The address of the Internal Revenue Service is: Internal Revenue Service, Attention CC:PA ,1111 Constitution Avenue, N.W., Washington, D.C. 20224.

#### Exemptions

The Freedom of Information Act, 5 U.S.C. 552, does not apply to matters that are:

(b)(1) • specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and are in fact properly classified under such executive order.

(b)(2) • related solely to the internal personnel rules and practices of an agency;

(b)(3) • specifically exempted from disclosure by statute (other than section 552b of this title), provided that the statute

---

Notice **393** (Rev. 04-2006) Cat. No. 45803X   Department of the Treasury – **Internal Revenue Service**

# Exhibit C



**MILLER & CHEVALIER**
CHARTERED

655 FIFTEENTH STREET, N.W., SUITE 900
WASHINGTON, D.C. 20005-5701
202.626.5800 FAX: 202.628.0858
WWW.MILLERCHEVALIER.COM

SHANE T. HAMILTON
202.626.5873
shamilton@milchev.com

June 29, 2007


VIA FEDERAL EXPRESS

IRS Appeals
Attention: FOIA Appeals
5045 E. Butler Avenue
M/Stop 55201
Fresno, California 93727

> Re:    Appeal of IRS Determination to Withhold Records Exempt from the
> Freedom of Information Act

Dear Sir or Madam:

     Miller & Chevalier Chartered ("Appellant") appeals the initial determination of Internal Revenue Service ("IRS") Disclosure Office 3, denying in full Appellant's April 6, 2005, request for records under section 552 of the Freedom of Information Act (the "FOIA") (5 U.S.C. § 552). Appellant's request for records (the "FOIA Request"), with enclosures, is attached hereto as Exhibit A, and the IRS's initial determination (the "Initial Determination") is attached hereto as Exhibit B.

     Appellant appeals Disclosure Office 3's adverse determination pursuant to FOIA § 552(a)(6)(A)(i) and Treas. Reg. § 601.702(c)(10) and requests that the Commissioner grant Appellant's request for records.

     Appellant relies on the following facts and authorities in support of its appeal.

FACTS

     Carol Gruenburg, Director of Library Services for Appellant, submitted the FOIA Request on behalf of Appellant, together with one enclosure, a copy of the transmittal memorandum for Treasury Decision ("T.D.") 6998, to the HQ Disclosure Office at 1111 Constitution Avenue, NW, in Washington, D.C. on April 6, 2005. The materials requested by Appellant in the FOIA Request were:

> (1)    a copy of the transmittal memorandum dated April 9, 1968, which accompanied T.D. 6952, and which is referenced on page 3 of the copy of the transmittal memorandum for T.D. 6998 enclosed with the FOIA Request;

IRS Appeals
June 29, 2007
Page 2

    (2)   a copy of a memorandum that was originally attached to the transmittal
memorandum for T.D. 6998 and that was referred to on page 10 of the copy of
the transmittal memorandum for T.D. 6998 as a "memorandum containing
more detail on this subject from this office to the office of the Assistant
Commissioner (Technical)."

The Initial Determination, dated June 4, 2007, and signed by Joan D. McClean,
Disclosure Manager, Baltimore Disclosure Office (Disclosure Office 3), denied Appellant's
FOIA Request in whole. The Initial Determination indicates that the transmittal
memorandum dated April 9, 1968, is being withheld in its entirety pursuant to the FOIA
exemption set forth in FOIA § 552(b)(5) ("FOIA Exemption 5"), which exempts from
disclosure inter-agency or intra-agency memoranda protected by the deliberative process
privilege, the attorney work product privilege, and the attorney-client privilege. The Initial
Determination indicates that the Chief, Disclosure Litigation Support Branch conducted a
search for the "memorandum containing more detail" but found no documents specifically
responsive to Appellant's FOIA Request.

### STATEMENT OF AUTHORITIES AND APPELLANT'S POSITION

As discussed above, IRS Disclosure Office 3 claimed in the Initial Determination that
the transmittal memorandum dated April 9, 1968, is exempt from disclosure under FOIA
Exemption 5. However, technical memoranda pertaining to proposed Treasury decisions and
regulations that have been approved by Treasury are generally not protected from disclosure
by FOIA Exemption 5. *See Taxation with Representation Fund v. Internal Revenue Service*,
646 F.2d 666 (D.C. Cir. 1981). Technical memoranda generally summarize or explain
proposed regulations, provide background information, state the issues involved, identify any
controversial legal or policy questions, discuss the approach taken by the draftsperson, and
give reasons for that approach. *Id.* at 671. They "may be fairly equated with 'legislative
history' accompanying a newly enacted statute." *Id.* at 683. They have been informally
adopted by the Internal Revenue Service as explanations of its policy and are used by IRS
personnel as the "working law" of the agency; as such, they are not protected under FOIA
Exemption 5. *Id.* at 683. Because the transmittal memorandum sought by Appellant pertains
to T.D. 6951, which was approved by Treasury and published in the Federal Register (33
F.R. 5848) on April 16, 1968, Appellant disagrees with the position of IRS Disclosure Office
3 that the transmittal memorandum dated April 9, 1968 is exempted from disclosure by FOIA
Exemption 5. Therefore, Appellant requests that the Commissioner grant Appellant's request
for the transmittal memorandum.

As discussed above, the Initial Determination indicates that the Chief, Disclosure
Litigation Support Branch conducted a search for the "memorandum containing more detail"
but found no documents specifically responsive to Appellant's FOIA Request. According to
the technical memorandum for T.D. 6998, the "memorandum containing more detail" was
originally attached to that technical memorandum. Generally, technical memoranda
addressing proposed regulations or proposed Treasury decisions are drafted by attorneys in

IRS Appeals
June 29, 2007
Page 3

the Legislation and Regulation Division of the IRS Office of Chief Counsel from the Commissioner of the IRS to the Assistant Secretary of the Treasury (Tax Policy). *See Taxation with Representation Fund*, 646 F.2d at 671. Typically, a technical memorandum is sent to the Treasury Department with a transmittal memorandum and the final form of the proposed regulations to which it pertains. *Id.* After the Secretary of the Treasury approves this package, the proposed regulation is returned to the Legislation and Regulations Division for processing, and the other documents are retained at Treasury, where the documents are filed consecutively by Treasury Decision number. *Id.* Appellant takes the position that the "memorandum containing more detail" was likely retained by Treasury with the transmittal memorandum and technical memorandum for T.D. 6998. Therefore, Appellant questions whether an appropriate search was made for this transmittal memorandum.

### CONCLUSION

Appellant asks the Commissioner to grant Appellant's request for the transmittal memorandum dated April 9, 1968, and Appellant's request for the memorandum originally attached to the transmittal memorandum for T.D. 6998.

Appellant desires to be notified of the determination on appeal at the following address:

Shane T. Hamilton
Miller & Chevalier Chartered
655 Fifteenth Street, NW
Suite 900
Washington, D.C. 20005

* * *

Sincerely,

Shane T. Hamilton
Miller & Chevalier Chartered

Enclosures

cc:    Joan D. McClean

# Tab A

**M I L L E R   &   C H E V A L I E R**
CHARTERED

655 FIFTEENTH STREET, N.W.   SUITE 900
WASHINGTON, D.C. 20005-5701
(202) 626-5800   FAX: (202) 628-0858

(202) 626-6094
April 6, 2005

HQ Disclosure Office
1111 Constitution Ave, NW
Room 1571
Washington, DC 20224

Dear Sirs:

Please provide me with copies of the following material under the Freedom of Information Act, IRC § 6110 as applicable, and your agency's implementing regulations:

> The transmittal memorandum dated April 9, 1968, which accompanied TD 6952 (as referenced on p.3 of attached TM for TD 6998).
> A copy of the, "memorandum containing more detail on this subject from this office to the office of the Assistant Commissioner (Technical)," originally attached to the transmittal memorandum for TD 6998. (Referenced on p.10 of the attached TM for TD 6998).

If for any reason you determine that portions of the requested information are exempt from disclosure under FOIA, please delete the allegedly exempt material, inform me of the basis for the claimed exemption, and furnish me with copies of those portions of the document that you determine not to be exempt. My consent to such deletion at this time is designed to facilitate your prompt response and in no way waives my right to appeal any determination that you may make regarding the applicability of any FOIA exemptions to the requested documents and information.

In compliance with applicable regulations under §601.702(f)(3)(A), "Commercial Use Requester," we promise to pay reasonable charges for search, copying and review costs. I understand that I can expect a response within 20 days of your receipt of this letter.

If you have any questions about this request, I may be reached at: (202) 626-6094. I look forward to your response within twenty days, or earlier if possible. Thank you.

Sincerely,

Carol Gruenburg
Carol Gruenburg
Director of Library Services

Enc. (1)

1969 TM LEXIS 16, *

1969 TM LEXIS 16

T.D. 6998

"This document is not to be relied upon or otherwise cited as precedent by taxpayers."

Treasury decision--Allocation of income and deductions among taxpayers.

January 14, 1969

**REFERENCE:** [*1]

CC:LR-482-2
Br5:SAN

**TEXT:**
MEMORANDUM FOR: Honorable Stanley S. Surrey Assistant Secretary of the Treasury

There is transmitted herewith, with the recommendation that it be approved, a proposed Treasury decision containing an amendment to the Income Tax Regulations (26 CFR Part 1) under section 482 of the Internal Revenue Code of 1954, relating to the allocation of income and deductions among taxpayers.

A proposed amendment to the regulations was first published with notice of proposed rule making in the Federal Register for April 1, 1965 (30 F.R. 4256) and on August 2, 1966, the notice of April 1, 1965 was withdrawn and a new notice of proposed rule making was published in the Federal Register (31 F.R. 10394). On April 16, 1968, Treasury Decision 6952 covering all the proposed amendments to the regulations under section 482 with the exception of § 1.482-2 (b) (7) was published in the Federal Register (33 F.R. 5848). Also on April 16, 1968, a new notice of proposed rule making was published in the Federal Register (33 F.R. 5858) with respect to § 1.482-2 (b) (7) and § 1.482-2 (b) (3). Revenue Procedure 68-22 was announced simultaneously with the new notice of proposed rule making [*2] by issuance of T.I.R. 975. This Revenue Procedure provided that in examining income tax returns, making allocations, and disposing of cases for taxable years beginning prior to May 1, 1968, the Service would, when requested to do so by the taxpayer, apply the provisions of subparagraphs (3) and (7) of § 1.482-2 (b) of the proposed regulations as published in the Federal Register on August 2, 1966. Numerous written comments were received from the public and public hearings were held on June 18, 1968.

The proposed amendment to the regulations under section 861, relating to sources of income, which was published in the notice of proposed rule making in the Federal

2

Register for August 2, 1966, has not been finalized and that notice remains in effect.

Subparagraph (3) of § 1.482-2 (b) provides that, except in the case of certain services, an arm's length charge for the rendition of services will be deemed equal to the costs or deductions incurred. Along with the addition of a cross-reference to subparagraph (7), a new sentence has been added to the effect that, in order to avail themselves of the cost safe haven or the objective tests in subparagraph (7) which are based on costs, [*3] taxpayers must maintain books and records which will enable the Internal Revenue Service to verify the costs involved.

Subparagraph (7) of § 1.482-2 (b) describes those situations in which the rendition of services for related entities will not be deemed equal to the costs or deductions incurred. The format of subparagraph (7) remains unchanged except that more examples have been added illustrating the application of subdivisions (i) through (iv). The examples have been placed under a separate subdivision (v) and categorized according to the subdivisions which they illustrate. The substance of subparagraph (7) is unchanged from the notice. However, more detailed guidance and objectivity have been added. For example, an objective 25 percent test based upon costs has been added to subdivision (ii) for purposes of determining whether an entity renders services to related parties as one of its principal activities. As in the notice, no special exception is made in subdivision (ii) for any particular type of company, such as a jointly owned "cost company."

A detailed technical memorandum is in preparation.

(Signed) Sheldon S. Cohen

Commissioner

**EXHIBITS:**
TECHNICAL MEMORANDUM re: Treasury [*4] decision--Allocation of income and deductions among taxpayers ( § 1.482-2 (b) (3) and (7)).

This memorandum concerns Treasury Decision 6998 which contains an amendment to the Income Tax Regulations (26 CFR Part 1) under section 482 of the Internal Revenue Code of 1954, relating to the allocation of income and deductions among taxpayers.

History of Development of Regulations

A proposed amendment to the regulations was first published with notice of proposed rule making in the Federal Register for April 1, 1965 (30 F.R. 4256). On August 2, 1966, the notice of April 1, 1965, was withdrawn and a new notice of proposed rule making was published in the Federal Register (31 F.R. 10394). On April 16, 1968, T.D. 6952, covering all the proposed amendments to the regulations under section 482 with the exception of § 1.482-2 (b) (7) was published in the Federal Register (33 F.R. 5848). Also on April 16, 1968, a new notice of proposed rule making was published in the Federal Register (33 F.R. 5858) with respect to § 1.482-2 (b) (3) and (7). Revenue Procedure 68-22 was issued simultaneously with the new notice of proposed rule making by issuance of T.I.R. 975. This revenue procedure [*5] provided that in examining income tax returns, making allocations, and disposing of cases for taxable years beginning prior to May 1, 1968, the Service would, when requested to do so by the taxpayer, apply the provisions of subparagraphs (3) and (7) of § 1.482-2 (b) of the proposed regulations as published in the Federal Register on August 2, 1966. Numerous written comments were received from the public and public hearings were held on June 18, 1968.

3

As a result of comments from the public, and of further comments from other offices of the Service, certain changes were made in T.D. 6998 from the notice.

The proposed amendment to the regulations under section 861, relating to sources of income, which was published in the notice of proposed rule making in the Federal Register for August 2, 1966, has not been finalized. That notice remains in proposed form.

Brief Explanation of the Provisions

Paragraph (b) (3) of § 1.482-2 of the final regulations expresses the general rule that the arm's length charge for the rendition of services to related entities is the amount which was charged or would have been charged for the same or similar services in independent transactions with [*6] or between unrelated parties under similar circumstances considering all relevant facts. In the interest of giving taxpayers the greatest assurance possible that intercompany charges will not-be disturbed on subsequent audit by the Service, subparagraph (3) provides a safe-haven rule under which, with the exception of certain services, the arm's length charge for services rendered to related entities will be deemed equal to the costs or deductions incurred by the renderer with respect to such services unless the taxpayer establishes a more appropriate charge under general arm's length standards.

Paragraph (b) (7) of § 1.482-2 describes those cases in which the safe-haven cost rule may not be used. The August 2, 1966, notice described as exceptions to the safe-haven rule five specific situations which were intended to describe circumstances in which the services were considered to be part of a trade or business. Experience with this rule indicated that the exceptions to the safe-haven rule listed in the notice of August 2, 1966, were inadequate and allowed substantial income shifting in certain cases where the rendition of the services in issue was a key element in the operations [*7] of either the renderer or recipient. As a result, a new notice was published on April 16, 1968. That notice listed four different situations in which the safe-haven rule may not be used. These situations reflect circumstances in which the services rendered are considered to be an integral part of the business activity of either the entity rendering the services or the entity receiving the benefit of the services. The transmittal memorandum dated April 9, 1968, which accompanied T.D. 6952 (at pages 12-17) provides further detail as to the reasons for this change. 

Detailed Discussion

§ 1.482-2 (b) (3)

Maintenance of Books and Records. In addition to a cross reference to subparagraph (7), a new provision is contained in subparagraph (3) to the effect that where costs or deductions are a factor in applying the provisions in paragraph (b) of § 1.482-2 of the regulations, the taxpayer must maintain books and records which are complete enough to allow the revenue agent to verify the costs or deductions involved. Costs or deductions are used in paragraph (b) both as a method of computing the safe-haven charge for services and as a basis for several objective tests in [*8] subparagraph (7) which determine the applicability or nonapplicability of specific subdivisions with respect to the services in issue. The use of costs or deductions in the services area benefits taxpayers by giving them additional assurance that their transactions will not be disturbed on subsequent audit. Its use is at the option of the taxpayer, not the Government. Thus, it is fair and proper to place an explicit burden on the taxpayer to maintain adequate books and records so that the figures involved may be readily

4

ascertained. This makes explicit a requirement which was already implicit in the regulations. A determination by the district director of an arm's length charge generally will not be overturned by the courts unless it can be shown to be arbitrary or unreasonable. Where a determination under these regulations of the arm's length charge for the rendition of services is based upon an analysis of costs and the taxpayer does not make available to the revenue agent books and records adequate for the computation or verification of those costs, it is neither arbitrary nor unreasonable for the district director to make his determination of the arm's length charge on general [*9] arm's length standards. It is contemplated that where taxpayers have not maintained adequate books, and records, agents may insist on application of the arm's length standard without regard to the cost safe haven.

§ 1.482-2 (b) (7)

The introductory language has been somewhat simplified. There is no substantive change in this language. Subdivisions (i) through (iv) describe those situations in which services will be considered an integral part of the business activity of a member of the controlled group. Subdivision (v) provides examples of the application of subdivisions (i) through (iv).

Subdivision (i)

This subdivision provides, in effect, that services may not be rendered at cost by utilization of the safe-haven rule where either the renderer or recipient of the services is engaged in the trade or business of rendering the same or similar services to one or more unrelated parties. The only change from the April 16, 1968, notice is that the phrase "unrelated parties" was expanded to "one or more unrelated parties" for the purpose of clarity.

The term "same services" in the notice of August 2, 1966, was changed to "same or similar services" in the notice of [*10] April 16, 1968, to eliminate the possible construction that subdivision (i) does not apply if the services rendered to unrelated parties are not identical to the services rendered to related parties. The new language better describes the situations intended to be covered. Example (1) in new subdivision (v) demonstrates the application of the principles of subdivision (i). The example illustrates a situation in which the renderer of the services renders a broader range of services to related parties than to unrelated parties. The fact pattern in the example serves to illustrate that where the renderer renders a series of interrelated services to related parties (including services not rendered to unrealted parties), the services will not be fragmentized if, when taken as a whole, they are similar to services rendered to unrelated parties as a trade or business.

Subdivision (ii)

Subdivision (ii) of § 1.482-2 (b) (7) provides, in effect, that services may not be rendered at cost by utilization of the safe-haven rule where a principal activity of the member rendering the services is the rendition of services to related parties. * In such situations, i.e., where a principal [*11] business purpose for the existence of the separate entity is to render services, it is generally appropriate to require a profit. This is especially so in two situations. The first is the case of the corporate group which maximizes its use of surtax exemptions by having the parent or another member of the corporate group render at cost a broad range of services such as warehousing, purchasing, invoicing, accounting, inventory control, etc. The second is the case where the parent of a corporate group is the only member of the controlled group located in the United States and attempts to conduct a large scale operation at cost for the

5

benefit of its foreign subsidiaries. In the first case, although one corporation is performing a major portion of the activity which generates the overall profit of the group, this profit is spread over numerous subsidiaries so as to avoid the higher surtax rate on the profit. In the latter case, the U.S. corporation may incur a substantial portion of the total costs of operations of the entire group, but the profit will all be reported outside the United States.


\* The notice refers to the rendition of services to related entities. The term "entities" has been changed to "parties." The former term is used in the section 482 regulations as a word of art connoting an "organization, trade, or business," i.e., an entity to or from whom an allocation may be made under section 482. For purposes of determining whether an entity renders services to related parties as \*\*\* one of its principal activities the question of whether or not an allocation may be made to or from the recipient is irrelevant. Thus, the term "parties" has been substituted for the term "entities." [*12]

The principal activity rule additionally prevents an entity that is engaged in the trade or business of rendering services to unrelated parties from avoiding subdivision (i) by spinning off a segment of its operations to a new entity which would then render the same services exclusively to related parties. Subdivision (ii) provides greater detail and objectivity than appeared in subdivision (ii) as proposed April 16, 1968. It is now divided into subdivisions (a), (b), and (c).

1. The Principal Activity Test.

In response to comments from the public, subdivision (ii) was amended to provide further guidance as to what constitutes a principal activity. To this end, an objective test has been added. Where this test is applicable, the renderer of services will not be considered to render services to related parties as one of its principal activities if the renderer's costs attributable to the rendition of services to related parties fall below an amount equal to 25 percent of the total costs or deductions of the renderer exclusive of amounts properly reflected in the cost of goods sold of the renderer. If the total costs incurred in the rendition of services to [*13] related parties is above the 25-percent level or if the 25-percent test is not applicable, the determination of whether the rendition of services to related parties constitutes one of the principal activities of the renderer must be made on an analysis of the facts and circumstances of each particular case. Several factors are listed as exemplary of the type of analysis contemplated. They are: the time devoted to the rendition of the services, the costs incurred by the renderer in the rendition of such services (in relation to the total operating costs), the regularity with which the services are performed, the amount of investment, the risks involved, and the nature of the activity.

The decision to use the 25-percent figure was based on considerations of policy, the study of specific cases, conferences with revenue agents selected on the bases of their experience with corporations of varying size and nature, and comments of taxpayers. A large percentage was used in order to make the test of practical use to taxpayers. In adopting a high percentage, consideration was given to the function subdivision (ii) was intended to serve and the overriding policy adopted when § 1.482-2 [*14] of the regulations was first drafted. This overriding policy was and remains that services may generally be rendered at cost. In view of this overriding policy some doubt was expressed when the April 16, 1968, notice was originally drafted as to whether subdivision (ii) should even be included. Those who opposed the inclusion of subdivision (ii) felt that certain types of cost operations should be permitted under the

6

regulations. The decision to include subdivision (ii) in the notice was based on the fact that its exclusion would allow certain obvious abuses, such as the case of the corporate group which abuses the multiple surtax privilege and the case of the multimillion dollar parent shifting all the income attributable to its activities to its foreign subsidiaries. The obvious abuses typically involved cases in which the renderer devoted 100 percent of its energies to the rendition of services to related entities. With this in mind, it was decided that a percentage as high as 25 percent would rarely jeopardize our ability to exclude from the safe-haven rule those cases which subdivision (ii) was primarily intended to cover.

Another consideration was that a major portion [*15] of the cases which would be covered by a lower percentage involved situations in which the profit factor is minimal. The opinion has been expressed several times that if the regulations served to encourage taxpayers with foreign affiliates to receive reimbursement for full cost, they would be of tremendous benefit to the Government. It should also be kept in mind that application of the 25-percent test only creates a presumption that services below the 25-percent level are not "principal." Although admittedly this presumption would be difficult to rebut, this option is available in an appropriate case.

The denominator of the formula (the "total costs or deductions of the renderer") excludes amounts properly reflected in the cost of goods sold of the renderer. This exclusion is in apparent conflict with a similar formula in subdivision (iv). There are valid conceptual, as well as administrative, reasons for the difference. These reasons are discussed in detail in the explanation of subdivision (iv), infra pp. 30-33.

Consideration was also given to excluding from the denominator interest on general indebtedness. Interest on general indebtedness is an expense item which [*16] is not allocable to the cost of services as an indirect expense ( § 1.482-2 (b) (5)). It is conceivable that increased interest expense could be generated by a renderer as a device to increase its total costs or deductions in the denominator in order to bring the cost of services below 25 percent. Exclusion of the interest factor to preclude such manipulation was, however, rejected. Excluding interest expense from the denominator would have increased the verbosity and complexity of the subdivision, caused potential additional audit problems, and raised the question of whether the same exclusion should be added to the formula in subdivision (iv). Further, if the additional indebtedness is for no other purpose than to meet the 25-percent test, the Service has the traditional weapons of substance over form, sham transaction, business purpose, etc.

2. Inapplicability of 25-percent test--Nonarm's Length Transaction.

The 25-percent test, which is based on costs, is limited to situations in which the renderer has a usable cost basis for all elements of its operations. This restriction is primarily intended to exclude from application of the test individuals and those partnerships [*17] which do not have a usable cost basis for services rendered by individuals in a proprietary position. The restriction provides that where any of the costs or deductions of the renderer do not reflect arm's length consideration and no adjustment is made under any provision of the Internal Revenue Code, the 25-percent test is not applicable. However, if the effect of the variation from arm's length is not significant enough to affect the outcome of the test, the restriction is disregarded. The effect of the latter provision is that, in situations where there is no usable cost basis, the 25-percent test is applied in substance, but only after all transactions involving the renderer have been taken into consideration (for purposes of this computation) on an arm's length bawsis. *

7

* For example, assume partnership ABC has in its employ, aside from the partners, employees, D, E, and F and that the partners, A, B, and C do not draw a salary. Assme further that, had A, B, and C, been employed by a comparable partnership in which they were not partners (but performed the same services), they would have been paid $50,000 each. D, E, and F receive $10,000 each for their services and partnership ABC has no other expenses. If A, B, and C devote half of their time to the rendition of services to a related corporation (in their capacity as partners) and all other services performed by the partnership are rendered to unrelated parties, the cost of services to related entities would be zero and the total costs or deductions of the partnership would be $30,000 (the salaries of D, E, and F). Applying these figures to the 25-percent test, the ratio of cost of services to total costs or deductions would be 0/30 or 0 percent. By such an analysis, partners could perform an infinite amount of services for related entities and the partnership would never fail the 25-percent test. In the given example, the costs or deductions of partnership ABC do not reflect arm's length consideration with respect to the services performed by A, B, and C since an arm's length consideration for their services is $50,000 each. By making adjustments to reflect arm's length considerations it can readily be seen that the variance from arm's length does affect the outcome in this case (viz., 1/2 X [$50,000 + 50,000 + 50,000] / [$50,000 + 50,000 + 50,000 + 30,000] = $75,000 / $180,000 = 41.7%). Therefore, the 25-percent test would not apply and a facts and circumstances analysis would be required. [*18]

Since a detailed audit of each nonarm's length transaction in every case would be administratively impractical it is contemplated that the measure of the significance of the deviation from arm's length will be based upon a carefully developed estimate by the agent. A precise computation of the variance from arm's length would only be required where an estimate by the agent indicates that the percentage resulting after adjustment will be close to 25 percent. In most cases the effect of the variance will be obvious without such precise analysis.

The wording of the limitation with respect to nonarm's length transactions was carefully constructed to avoid any implication as to whether or not an allocation can be made under section 482 between an individual and his controlled entity since there is considerable disagreement as to when such an allocation can be made and whether such an allocation should be made in certain cases, particularly in the unreasonable compensation area. A literal reading of this limitation could lead to the interpretation that where there was no charge made to the renderer for services performed for it by an individual in a proprietary position the 25-percent [*19] test is applicable without adjustment since (1) all costs or deductions reported by the renderer reflect arm's length consideration and (2), in the case of the sole proprietorship and in certain partnership situations, no adjustment can be made. However, in the context of the entire subdivision (ii) (and the purpose of the 25-percent test), the only reasonable interpretation of the restricting sentence is that where the renderer's books show a zero cost for services performed for it and the arm's length value of the service performed for the renderer is above zero, such cost or deduction (zero) obviously does not reflect an arm's length consideration. Thus, in those situations in which no adjustment to arm's length can be made under any provision of the Internal Revenue Code obviously no adjustment is made and, for purposes of this computation, the costs or deductions must be considered on the basis of what they would have had an adjustment been made. The result under the former "literal" application of the restricting sentence would be patently incorrect in most cases. It is the latter interpretation which expresses the intent of the drafters. Were this [*20] issue ever to result in litigation, it is highly probable that a court would accept that interpretation

8

which gives a reasonable result in the context of the principle described as opposed to that interpretation which could give a result patently inconsistent with such principle.

The decision by the 2nd Circuit in Victor Borge, (405 F.2d 673, 69-1 USTC P9131, aff'g 26 T.C.M. 816 (1967)) upheld the right of the Service to make an allocation under section 482 between an individual and his controlled corporation where the individual is engaged in a trade or business and renders services to his controlled corporation in connection with that trade or business. In that case, Victor Borge, a professional entertainer, contracted to provide entertainment services on behalf of his controlled corporation. The taxpayer challenged the Commissioner's allocation on the basis that he did not constitute an "organization, trade, or business" as required by the statute. The court held that Borge was in the entertainment business and, thus, an allocation between the corporation and the entertainment business was proper.

In the context of the Borge case it is unimportant whether the cost [*21] of Borge's services to his entertainment business (treating Borge and his business as two separate parties for this purpose) reflects arm's length consideration. If 100 percent of Borge's entertainment services are rendered for the benefit or on behalf of his corporation then the ratio of the cost of services to the total costs or deductions of the entertainment business will be 100 percent whether it is 10 /10 or $75,000/$75,000. If Borge, in addition to rendering entertainment services to his corporation, renders entertainment services to unrelated parties he falls within subdivision (i) and any question as to the applicability of subdivision (ii) is moot. * Thus, in most every case in hich an individual renders services to a controlled entity in connection with a trade or business carried on by him the safe-haven cost rule will not be applicable since: (1) if this represents 100 percent of his activity it will be covered by the 25-percent test; (2) if he also renders similar services to unrelated parties subdivision (i) will apply; and (3) if the services rendered to unrelated parties are not similar to those rendered to related parties (e.g., entertainment services [*22] and piano teaching services), it is likely that the individual is engaged in two (or more businesses and with respect to the services rendered to the controlled entity in connection with one of the businesses (e.g., the entertainment business), the cost of those services will represent 100 percent of the total costs or deductions of that business.

* Borge probably also runs afoul of subdivision (iii).

As noted previously, it is not clear how far the concept of requiring an allocation between a shareholder-employee and his controlled entity (on the basis that the employee's rendition of services to the corporation constitutes a business) can or should be extended. It should be noted that the Borge case involved the carrying on by an individual of a business separate and distinct from that business carried on by the corporation. The court in that case distinguished between devoting time and energy to a corporation "in the hope of realizing capital gain" and the rendition of services to the corporation in order to earn ordinary income.

3. Inapplicability of 25-percent Test--Manufacturing etc., Activities.

Also excluded from the 25-percent test are services which [*23] constitute a manufacturing, production, extraction, or construction activity. These services are tested independently of the 25-percent test on a facts and circumstances basis. However, they are additionally included in the 25-percent test for purposes of determining whether or not the renderer renders services in general (i.e., of all types) to related entities as one of its principal activities.

9

One of the reasons mentioned previously for the use of the high 25-percent figure was the assumption that a major portion of the services affected by the safe-haven rule are services of the type which would command a minimal profit. The services so contemplated are services such as bookkeeping, supervisory services, minor technical services, etc. However, manufacturing, production, extraction, and construction services are ordinarily not of such a nature. Normally, services of the latter type will command a high profit and be a key element in the operations of an entity. In the case of a large diversified corporation, the costs of such services may often represent less than 25 percent of its "total costs." For this reason, these services were specifically excluded from the 25-percent [*24] test.

An additional reason why these services have been singled out is to prevent a complete manufacturing function from being classified as a service function merely by having the manufacturing entity place title to its raw materials in the hands of an affiliate and thereby having the affiliate become the recipient of manufacturing services. The best example of this is the case in which an entity is performing contract manufacturing services where the identical activity would be classified as a sale if the title to the raw materials were held by the "renderer" rather than the "recipient." This may often develop into a substance over form argument. However, where the activities are nearly identical, the rules applicable for determining an arm's length charge should be substantially the same. Singling out these four specific types of services provides for this result. A number of examples have been added illustrating the application of this exception to the 25-percent test.

Some consideration was given to excluding selling services from the application of the 25 percent. However, due to the additional complexities such a provision would add, particularly in connection with [*25] definitional problems, it was decided that exclusion was not warranted. An example of the definitional problems is the question of whether advertising is a selling service and, if so, what constitutes advertising?

4. "Cost Companies"

It was noted in the transmittal memorandum accompanying T.D. 6952, dated April 9, 1968, that subdivision (ii) as proposed, would often permit the district director to require a profit to be reported by the so-called "cost companies", i.e., companies operating at cost and owned jointly by two or more unrelated parties. That memorandum stated, at page 16,

An argument can be made (the entity theory notwithstanding) that many of these companies are in fact joint ventures or cost-sharing arrangements and as such should not be forced to show a profit. This is apparently the theory which justifies the Service's position on captive mining companies in Rev. Rul. 56-542, C.B. 1956-2, 327, and which could be extended to cover joint newspaper publishing facilities and similar situations as well. Recognizing the possible conflict between subdivision (ii) and Rev. Rul. 56-542, it is contemplated that any conflict will be resolved before the new proposed [*26] (b) (7) regulations are finalized. This will probably be accomplished either by a change in the final regulations or by the issuance of a revenue procedure or revenue ruling.

After a series of meetings within the Service and after meetings with the American Iron Ore Association, representing the group principally concerned over this apparent conflict, it was determined that this problem would be resolved outside of the regulations. There is some question as to the effect, if any, of the regulations upon the "captive mining companies" sanctioned by Rev. Rul. 56-542. The doubt centers around

10

the nature of the services rendered, who is the renderer of the services, and the appropriate arm's length charge. A copy of a memorandum containing more detail on this subject from this office to the office of the Assistant Commissioner (Technical) is attached.



In areas other than captive mining companies, the most likely tax effect of the allocation of income to the "cost company" would be the possibility of an additional $25,000 of income being exempted from the surtax. In light of our general policy to refrain from applying section 482 where there is no substantial tax benefit to the [*27] Government, it is unlikely that the regulations will have any real effect on these operations. In any case in which use of a jointly owned "cost company" causes a substantial tax difference (which is most likely to occur in cases involving loss corporations, foreign corporations, or special status corporations, such as Western Hemisphere Trade Corporations) a departure from the entity theory in such a case is inappropriate and section 482 should generally be applied.

5. The "Consolidated Group" Rule.

Subdivision (ii), as proposed on April 16, 1968, also affected the right of a group of related entities to operate a separate "technical services" corporation at cost. Such a corporation typically renders merely administrative and office services such as bookkeeping, mail and messenger services, communication, travel, and other similar support activities. Where this type of corporation operates at cost, usually no tax is avoided if the recipients of the services are domestic entities. If, however, the service corporation renders services to foreign affiliates, loss corporations, or United States corporations enjoying a special tax status (such as Western Hemisphere Trade Corporations), [*28] any profit which may be attributable to those services is shifted to the recipient corporation and may escape U.S. taxes altogether or be taxed at a lower rate than if the rendering corporation had reported the profit. Often, a large corporate group with international operations will have a domestic "technical services" corporation based in a foreign country rendering services to the foreign members of the controlled group. It is our understanding that a number of corporate groups have negotiated agreements with the foreign countries in which their "technical services" corporation is based whereby the foreign country agrees to refrain from imposing a tax on the payments for services rendered to related foreign entities and additionally agrees not to classify the "technical services" corporation as a permanent establishment of the U.S. parent corporation. These agreements are subject to the condition that the charges made by the service corporation be at cost only and that the agency rendering the services be separately incorporated in order to facilitate the accounting for such costs. Application of section 482 in this situation could conceivably result in upsetting these agreements. [*29] Taxpayers affected by this noted that if these same "technical services" were rendered by a division of the parent corporation instead of by its subsidiary, the services rendered would not be a principal activity of the parent as defined in subdivision (ii). If the parent and subsidiary file a consolidated return they are taxed essentially as if the two entities were one taxable unit. Therefore, in the interest of avoiding disruption of normal business practices, the regulations provide that services may be rendered at cost where, had the parent and subsidiary been one, the rendition of the services at cost would have been sanctioned (under the regulations). To this end, (c) of subdivision (ii) has been added. This subdivision (c) provides that, at the option of the taxpayer, the operations of a consolidated group will be considered in the aggregate to determine whether services rendered by a member of the consolidated group to another related entity outside the consolidated group constitute one of the principal activities of the renderer. In this case, the entire consolidated group is treated as the renderer. However, this "consolidated group" rule is applicable [*30] only for purposes of the 25-percent test.

11

Thus, if the 25-percent test is not met, the facts and circumstances test in (a) of subdivision (ii) is applied on an entity by entity basis.

The consolidated group is defined as all members of a group of controlled entities created or organized within a single country and subjected to an income tax by such country on the basis of their combined income. It was felt that limiting the definition to those corporations filing a U.S. consolidated return would, on its face, work in a discriminatory manner by disallowing comparable treatment to foreign corporate groups following a tax reporting concept similar to the U.S. consolidated return concept.

It should be noted that this rule does not apply to services rendered by one member of the consolidated group to another member of the consolidated group. Treatment of the entire group as one entity is inappropriate for purposes of measuring transactions between members of that group. Generally, the question of whether a profit should be charged between two members of a consolidated group will be academic since the resulting income and expense items will offset each other on the consolidated [*31] return. Differentiating between related entities within the consolidated group and related entites outside the consolidated group may cause the anomalous result of allowing a charge of cost on the rendition of services to a foreign entity and requiring a profit on the rendition of identical services to a domestic entity. The alternatives would be either to allow all service transactions within the consolidated group to be rendered at cost (which may also cause an anomalous result where a profit is required on the rendition of the identical services to a foreign entity) or to incorporate transactions between members of the consolidated group in the rule. The latter alternative, i.e., incorporation in the rule, is conceptually weak since it would entail treating both the renderer and the recipient as the renderer. The alternative of allowing all such transactions at cost is unacceptable since shifting of income between members of a consolidated group may have a substantial tax effect in certain cases. In short, the potentially different results of applying section 482 transactions between a member of the consolidated group and a related entity outside the consolidated group [*32] is justified since the analysis by which the consolidated group is treated as one entity breaks down when applied to transactions within the one group.

6. Application of the "Consolidated Group" Rule -- Services in Connection with the Transfer of Property.

Some complications are created by use of the "consolidated group" rule. Subparagraph (8) of § 1.482-2 (b) provides that when property is transferred between two controlled entities and services are rendered by the transferor in connection with the transfer, the amount of any allocation shall be determined in accordance with the rules in paragraph (c), (d), or (e), whichever is appropriate, and no separate allocation with respect to the services shall be made. For example, were X to render warranty services to Y in connection with the sale of property to Y by X, no separate allocation for those services would be made under paragraph (b) of § 1.482-2. Rather, the value of those services would be considered in making an allocation to reflect an arm's length sales price of the property under paragraph (e) of § 1.482-2. Conceivably, the transferor of the property and the renderer of the services could be two separate [*33] parties. For instance, rather than X rendering warranty services to Y, Z, another related entity, could have rendered those services (possibly at cost under paragraph (b)). Although this potential existed before the "consolidated group" rule was created, the potential is increased by the addition of this rule since it allows greater flexibility in the rendition of services to foreign affiliates at cost. After attempting several drafts to resolve this problem, it was decided that it was not significant enough to warrant the increased complexity it would add to the regulations.

The problem may be resolved within the context of the existing regulations under one of two approaches. First, the regulations ( § 1.482-2 (b) (8)) refer to "services rendered by the transferor". It may be argued that where the transferor (X) and the entity actually rendering the services (Z) are part of a consolidated group and, under subdivision (ii) (c) of § 1.482-2 (b) (7), the consolidated group is considered the renderer, the transferor, as part of the group, is rendering the services for purposes of subparagraph (8). Hence, with X and Z, in the aggregate, being considered the renderer, it is [*34] appropriate to consider X as both the transferor and the renderer for purposes of subparagraph (8) of § 1.482-2 (b). Additionally, it may be argued in appropriate cases that, where the rendition of the services in connection with the transfer has enhanced the value of the property transferred, or facilitated the transfer, the services were rendered for the benefit of or on behalf of the transferor who, in turn, rendered them to the transferee. Both these approaches leave to be resolved (1) the appropriate allocation between the entity initially rendering the services (Z) and the transferor (X) and (2) how much to allocate (and the effect of repatriation) where the transferee (Y) has paid a service fee to the entity initially rendering the services (Z).

7. Application of the "Consolidated Group" Rule -- "Trade or Business" Services.

The addition of the "consolidated group" approach could allow an entity engaged in the trade or business of rendering services to unrelated entities to spin off a portion of its operations into another corporation (and, thus, avoid subdivision (i)) as long as the spun-off corporation was part of a large enough consolidated group. To deal with [*35] this potential a sentence was added to (c) of subdivision (ii) precluding the utilization of (c) with respect to services of a type which any member of the consolidated group renders to unrelated parties. Thus, the 25-percent test is applied on an entity by entity basis with respect to such services. The cost of such services, however, is included in the 25-percent test to determine whether the safe haven rule is available with respect to other services rendered to related entities if the taxpayer chooses to use the consolidated group rule.

8. Application of the "Consolidated Group" Rule -- "Double Deductions."

Another problem potentially created by the "consolidated group" rule was that a consolidated group could artificially build up the total costs or deductions of the group (for purposes of the 25-percent test) through intercompany transactions. For example, assume Z, a member of a consolidated group, needed a particular machine in its operations. Instead of buying the machine outright and, thus, having the depreciation of the machine as an operating cost of the group, X, another member of the group could buy the machine and rent it to Z. This would result in [*36] treating both Z's rent expense and X's depreciation expense as part of the operating costs of the group. In fact, this "double deduction" of sorts usually occurs when there is a transaction between two members of a consolidated group. To correct this, subdivision (c) provides for the elimination of intercompany charges. This has the effect of treating transactions between members of the consolidated group like transactions between divisions within a single corporation which, of course, is the proper result under the "consolidated group" rule.

Using the elimination of intercompany charges as a means to prevent "double deductions" allows for the situation in which Z in the above example buys the machine from X. In such a case, the depreciation on the machine will be included in the total costs or deductions of the group since the depreciation is not an intercompany charge. This, of course, is the proper result since there is no doubling up of deductions in such

a transaction.

13

9. Unresolved Problems Created by the "Consolidated Group" Rule.

There are other difficulties created by the addition of subdivision (c) which have not been resolved in the regulations. [*37] Perhaps the most important of these is the fact that this approach might suggest the argument that the consolidated concept should be extended to other parts of the section 482 regulations. The answer is simply that this approach was added as a practical solution for the limited purpose of correcting a potential inequity. This potential inequity was brought about by one subdivision within a rule and that rule, itself, is an exception to the general rule. Whereas it is appropriate for this limited purpose, further extention of this concept would not be proper. Consideration was given to adopting a broader rule which would have treated all members of the controlled group created or organized within a single country as the renderer (whether or not they were taxed on combined income). This was rejected, however, because it is the policy throughout the section 482 regulations to treat taxpayers similarly situated alike without regard to whether or not international operations are involved.

Whereas the justification for the addition of subdivision (c) was based on the "technical services" corporations, it is equally applicable to all services and may facilitate, for instance, [*38] the transfer at cost of management services and research and development services. It should be noted, however, that any transfer of services is additionally subject to subdivisions (i), (iii), and (iv). This new addition merely provides for the use of a separate corporation for the rendition of services that normally could be rendered by the parent corporation at cost without the application of subdivision (c). Again, although admittedly difficult to rebut, the 25-percent test is a presumption and, in extreme cases, may be rebutted.

In the case of research and development services, if the services result in the transfer of intangible property, the transaction is subject to the rules with respect to the transfer of use of intangible property ( § 1.482-2 (d)). Often research and development services, as well as management services, may involve the utilization of intangible property by the renderer. In such cases, subdivision (iii) will generally be applicable. In other cases the utilization of previously developed intangible property will be so predominate that the substance of the transaction will amount to the transfer of the previously developed property.

Some concern [*39] has been expressed that the services rules will be used to circumvent the need for a bona fide cost-sharing plan (as defined in § 1.482-2 (d) (4)). The bona fide cost-sharing plan provision in the regulations is intended as an aid to taxpayers and is available at their option. Since compliance with paragraph (d) (4) of § 1.482-2 will give taxpayers the greatest assurance that their arrangement will not be disturbed on subsequent audit, it is unlikely that a taxpayer will try to "circumvent" the cost sharing provision. The suggestion was made that a few taxpayers may avoid use of the cost-sharing provision in an attempt to conceal the fact that previously developed intangible property was used in the development of additional intangible property and, for this reason, research services should be specifically excluded from the services portion of the regulations. It is no more difficult, however, to conceal the use of previously developed intangible property under the cost-sharing provision than to do so under the services rules. The practical burden of the Service in uncovering such deception is the same in either case. If research services were excluded from the services rule [*40] (a position which would be difficult to justify), parties could enter into arrangements for the development of intangible property without strict compliance with such a cost-sharing provision in the regulations as long as the terms of the

14

arrangement were arm's length. Such an arrangement would be in compliance with the statute and, thus, would override any provision in the regulations to the contrary. Further, where two or more parties are jointly engaged in the development of intangible property, each as a developer (as opposed to one being an assister), activities engaged in by any one of the parties in their capacity as a developer are not services rendered by one party on behalf of or for the benefit of another party as contemplated in paragraph (b). Rather they are services rendered for the benefit of the renderer which collaterally benefit the other party or parties to the plan. Whether a party is a joint developer or an assister will be a question of fact. Guidance on this subject is provided in § 1.482-2 (d) (1) (ii) (c). Where a party is an assister and receives an interest in the intangible property developed, there has been a transfer within the meaning of § [*41] 1.482-2 (d).

The addition of subdivision (c) may subject the Service to the charge that it is discriminating against corporations not filing consolidated returns. For example, a multimillion dollar consolidated group may have a separately incorporated business, acquired as a going concern, performing services for the benefit of its related entities (outside the consolidated group). A member of another group of controlled corporations may perform identical services for its related entities and not be part of a consolidated group. Under the "consolidated group" rule, the former corporation, by application of the 25-percent test, may be able to render those services at cost whereas the latter corporation will be required to report a profit. This result can be justified on the basis that, in the case of the consolidated group, we are looking at one portion of the operations of a group essentially taxed as one unit, whereas in the latter case, the activity in issue constitutes the entire operations of that entity. Where the nonconsolidated corporation may elect to become part of a consolidated group the problem is lessened. It is probable that in those instances where the nonconsolidated [*42] corporation cannot become part of a consolidated group the rationale for application of the rule (i.e., the service corporation could be merged into its parent) will fail and the difference in treatment of the two corporations is justified. Additionally, elimination of the "consolidated group" rule would mean that a multimillion dollar corporation with a "technical services" division could render technical services at cost, but a comparable corporation with a separate, wholly owned "technical services" corporation (separately incorporated for valid nontax reasons) filing a consolidated return with the parent would be required to report a profit on identical services. Thus, wherever the line is drawn, some potentially dissimilar treatment will result. The consolidated group rule produces the most equitable result feasible.

Subdivision (iii)

This subdivision provides, in effect, that services may not be transferred at cost by utilization of the safe-haven rule where the renderer is peculiarly capable of rendering the services because they are of such a nature that they are not generally available elsewhere and, although not necessarily substantial in terms of the total [*43] activities of an entity, are a key factor in determining the success or failure of a particular profit making activity (and, thus, are a principal element in the operations of the recipient).

In response to comments from taxpayers, greater specificity has been added to this subdivision. The subdivision now describes three particularly advantageous situations or circumstances which, if availed of by the renderer in connection with the rendition of the services, will cause the renderer to be classified as "peculiarly capable" of rendering the services. These three situations or circumstances cover those areas in which it is contemplated that subdivision (iii) will most frequently come into play. They

15

are not, however, all inclusive and this subdivision may be applicable to a situation or circumstance not specifically described therein.

1. Special Skills and Reputation.

The first particularly advantageous situation or circumstance described is the utilization by the renderer of special skills and reputation in connection with the rendition of the services in issue. The conjunctive is used to indicate that the possession of neither special skills alone nor reputation alone [*44] is sufficient to classify the renderer as "peculiarly capable". This is the one situation or circumstance of the three specified with respect to which there has been greatest difficulty. This is intended to cover situations in which an individual or group of individuals, because of the possession of a special skill or talent, enjoys an outstanding reputation causing his (or their) services to command a premium. This would include an individual in the entertainment field, such as Victor Borge (see Victor Borge, supra, p.11). There is some feeling that a special rule in this situation is unwarranted since such an individual (or group of individuals), in the employ of an organization, trade, or business would command a salary which reflects the exceptional value of his (or their) services. Thus, when the organization, trade, or business renders the services of such employees to a related entity the costs incurred by the rendering entity is a fair reflection of the value of these services. Those who believe this rule is unnecessary further feel that when the individual performing the services is in a proprietary position and the entity employing him does not pay him a salary [*45] commensurate with his value, an allocation for such a salary under section 482 will normally be appropriate. This is premised on the conclusion that (1) an allocation can be made between an individual and an entity owned or controlled by such individual and (2) the services are such that one of the subdivisions in this subparagraph would apply without the use of a special rule in this subdivision.

As noted previously, there is some controversy as to when an allocation under section 482 can or should be made to or from an individual. It has been held, however, that where an individual is engaged in a separate trade or business an allocation may be appropriate (Pauline Ach, 42 T.C. 114 (1964), affirmed 358 F.2d 342 (1966), cert. denied 385 U.S. 899 (1966), (an allocation to a dress business owned as a sole proprietorship); Victor Borge, supra, p. 11 (allocation to an entertainer)). Inclusion of this situation here precludes the necessity of making two allocations, i.e., first between the individual and, for example, his corporation and then between two related corporations. Additionally, this protects the Government in cases in which an allocation to an individual [*46] is improper. Although the recent Court of Appeals decision in the Victor Borge case has added to the authority for an allocation between an individual and his controlled corporation, that decision noted that the individual was in a business which was separate and distinct from that of his corporation. The propriety of an allocation between an individual and his controlled corporation where the individual manages the business of the corporation is still in question although the opinion in the Victor Borge case can be read to lend support to such an allocation.

2. Influential Relationship.

The second particularly advantageous situation or circumstance covered in subdivision (iii) is the utilization by the renderer of an influential relationship with customers in connection with the rendition of the services in issue. An example of this is the selling services provided by certain automobile finance companies to their captive credit life insurance companies (See Local Finance v. Commissioner, 48 T.C. 773 (1967), aff'd 407 F. 2d 629 (CA-7, 1969), petition for cert. filed, September 5, 1969, 38 U.S. Law Week 3089, and example (10) in subdivision (v)). A great deal [*47] of difficulty was

encountered in arriving at words precise enough to cover this type of situation to the exclusion of the normal customer-vender relationship. Although the phrase "influential relationship" alone is insufficient for this purpose, it is sufficiently precise when combined with: the introductory language "particularly advantageous", a later test in the subdivision of value substantially in excess of cost, and examples demonstrating what is intended to be covered and what is not intended to be covered.

3. Utilization of Intangible Property.

The final particularly advantageous situation or circumstance covered in this subdivision is the utilization by the renderer of its intangible property in connection with the rendition of the services in issue. A cross reference to paragraph (d) (3) of § 1.482-2 is included for the broad definition of intangible property found therein. This is intended as the complement of paragraph (d) of § 1.482-2 in that it covers those situations in which the recipient of services, by virtue of the rendition of the services, enjoys the value of certain intangible property possessed by the renderer although the property or an interest [*48] therein is not transferred to the recipient within the meaning of paragraph (d). A number of comments from the public expressed concern that this subdivision would be used by agents to upset bona fide plans for the development of intangible property based on a sharing of the costs and risk of development (see paragraph (d) (4) of § 1.482-2). This fear stemmed from example (4) of the proposed regulations which has been replaced by more explicit examples. In example (4) of the proposed regulations the renderer makes use of a secret process it possesses in developing a product for the recipient. Although this example was technically correct, it has been eliminated since it is not clear that intangible property was not transferred under those facts and because the argument was made that it could have been used by agents as a basis for upsetting valid cost-sharing plans for the development of intangible property. Three new examples (examples (11), (12), and (13)) have been added in its place which more clearly demonstrate the situation intended to be covered. Since subdivision (iii) is not applicable where the recipient owns the requisite interest in the intangible property as the [*49] result of a bona fide cost-sharing plan, whenever the issue of utilization of intangible property arises during an audit, the agent should ascertain whether a cost-sharing plan is in existence. It is anticipated that agents will be so instructed.

4. Value Substantially in Excess of Cost.

In addition to the delineation of particularly advantageous situations or circumstances, a further limiting factor has been added to subdivision (iii). The final sentence of this subdivision provides that the renderer of the services will not be considered "peculiarly capable" unless the value of the services is substantially in excess of the costs incurred by the renderer in rendering the services. This additional restriction on the application of subdivision (iii) makes the subdivision conceptually complete. The peculiar capability intended to be covered in this subdivision is a capability of such a nature that cost is not a relevant measure of its value. Although subdivision (iii) would be more objective on its face without this addition, this additional subjectivity can only work to the taxpayer's advantage since it serves to eliminate from the subdivision services which would otherwise, [*50] on their face, be included under the other tests provided therein. This, of course, would eliminate services involving special skills and reputation where the compensation paid to the individual or individuals performing the services reflects the exceptional value of their services.

A weakness in the value in excess of cost test is that it requires a computation of the "value" of the services in order to determine whether an allocation reflecting value is necessary. In addition, this test adds the old problem of determining the meaning of

17

the phrase "substantially in excess". It was generally agreed that a value of 200 percent in excess of cost is substantial while a value of 20 percent in excess of cost is not substantial. It was further agreed, however, that no one figure can be prescribed for this purpose. Although further certainty could be added by an objective test for "substantially in excess" the nature of the subdivision does not lend itself to such precision. In addition, a precise figure (e.g. 50 percent) would require a precise valuation of the services leading to collateral and unnecessarily complex issues. It is believed that a vast majority of cases will [*51] fall clearly on one side or the other side of "substantially in excess" without the need for precise valuation.

Subdivision (iv)

This subdivision describes cases in which the recipient of the services has received the benefit of a substantial amount of services from related entities during the taxable year. It is intended to cover cases in which such a significant portion of the activities of the recipient represents services rendered to it by related entities that it is appropriate to reflect in the income of those related entities at least a portion of the income resulting from the activities of the recipient. The so-called paper company, in which virtually all the activities result from services rendered to the company by related entities, represents one type of case covered by this subdivision.

Subdivision (iv) includes an objective 25 percent-test of substantiality. The test is based on the relationship of the costs incurred by related parties in the rendition of services to the recipient during its taxable year to the total costs incurred by the recipient during the taxable year. For this purpose, the total costs incurred by the recipient is modified by including [*52] in the total cost the costs incurred by related entities in rendering services to the recipient and excluding amounts paid or accrued to related entities for such services and also excluding amounts paid or accrued for materials the cost of which is properly reflected in the cost of goods sold of the recipient. As pointed out in comments from the public, this objective test based on costs for one taxable year can cause inequitable results in certain cases. This may occur in the case of the inception of operations or the addition of operations or in the case of similar unusual circumstances of a nonrecurring nature which cause the total costs or deductions of the recipient to be deflated for the taxable year in issue. To alleviate potential inequities of this nature the test in the final regulations allows a taxpayer the option of using costs incurred over a 3-year period ending with the close of the taxable year in which the services in issue were rendered (or the first 3 years of operations if the recipient had been in existence for less than 3 years when the services in issue were rendered) where total costs are abnormally low due to an unusual event of a nonrecurring nature. [*53]

Differences in Cost Factors Between Subdivision (ii) and (iv)

As noted previously, there is an apparent inconsistency between the 25-percent test in subdivision (ii) and the 25-percent test in subdivision (iv). Both tests deal with the relationship of the cost of services in issue to the "total costs" of the renderer or recipient. The apparent inconsistency lies in the fact that while the numerator in both formulas involve the cost of services rendered, the denominator in subdivision (ii) excludes from "total costs" (of the renderer) amounts properly reflected in the cost of goods sold whereas the denominator in subdivision (iv) excludes from "total costs" (of the recipient) only the materials portion of the cost of goods sold (there are additional adjustments to the denominator in the subdivision (iv) test, but they are not pertinent to this discussion). Although obviously there is a difference in the two approaches there is no inconsistency since the difference is justified on both practical and conceptual bases.

The concept of the rendition of services as a principal activity (subdivision (ii)) and the concept of the receipt of a substantial amount of services (subdivision [*54] (iv)) are similar, but they are not identical. Because of the distinction different objective tests are used in the two subdivisions. Subdivision (iv) looks to the activities of the recipient, in total, to determine whether a substantial amount of effort behind that total was provided by related parties. Subdivision (ii) looks at the various activities of the renderer to determine whether one particular activity, i.e., the rendition of services to related entities may be appropriately considered one of the principal activites of the renderer.

Subdivision (ii), then, is concerned with situations in which one of the principal activities of the renderer is the rendition of services to related parties. If one of the activites of the renderer entails the sale of goods all amounts properly reflected in the cost of goods sold will be directly related to such manufacturing and/or selling activity. In most cases, this will be the principal activity of the renderer. The remaining "other deductions" represent amounts which are either in support of or unrelated to the manufacturing/selling activity. Since amounts reflected in the cost of goods sold are directly related [*55] to the manufacturing/selling activity of the renderer, those amounts are isolated and the costs or deductions which are not directly related to such activity are analyzed to determine if a substantial amount of those costs or deductions are applied to the rendition of services to related parties. If a substantial amount of the "other deductions" are for the rendition of services to related parties such activity will be considered one of the principal activites of the renderer.

In other words, the manufacturing/selling activity is presumed to be one of the principal activities of the renderer. This activity, therefore, is isolated from the other activities of the renderer. If a substantial portion of those remaining activities involve the rendition of services to related parties, this will be considered one of the principal activities of the renderer.

Isolation of the cost of goods sold is necessary in subdivision (ii) for two reasons. First, inclusion of the cost of goods sold (even without the cost of materials) would mean that any large manufacturer would be virtually exempt from the 25-percent test since the labor and overhead costs will generally exceed the "other [*56] deductions" by at least threefold. Hence, even if all other deductions were related to the rendition of services to related parties such activity would not be considered one of the principal activities of the renderer were cost of goods sold included in the denominator. Secondly, whereas the costs of labor and overhead may serve as a measure of the time and effort devoted to various activities, the costs of materials normally will not be a reliable measure of the time and effort factors. A formula which encompasses the relationship between the cost of materials and the costs of labor and overhead would not be a reliable measure of substantiality in terms of time and effort.

An additional problem results from an attempt to exclude only the cost of materials element of cost of goods sold in subdivision (ii). In cases involving a consolidated group, wherein a large number of corporations, in the aggregate, may be considered the renderer, the administrative burden involved in segregating the cost of materials would be great. Therefore, aside from the more important conceptual basis for eliminating cost of goods sold in subdivision (ii), there is a practical necessity for [*57] doing so.

Although it is reasonable to isolate and exclude the primary activity of the renderer (i.e., by eliminating the cost of goods sold) to determine whether the rendition of services to related parties is one of the principal activities of the renderer, such an

approach is not feasible with respect to the test in subdivision (iv). That test is concerned with the substantiality of services received from related parties in relation to the total activities of the recipient. Thus, where subdivision (iv) is concerned with the situation in which the amount of activity performed by related parties is so substantial that the ability of the recipient to independently generate income is often in question, subdivision (ii) is not concerned with the independent viability of the renderer.

The meaningfulness of the test in subdivision (iv) would be substantially weakened if the labor and overhead elements of cost of goods sold were eliminated since the most typical example of the type of company intended to be covered in that subdivision is the company which acts as the "superdistributor" of the products of its parent company. In the case of the "superdistributor" most [*58] of the costs of operations will be in the cost of goods sold and all or a major portion of those costs will represent services performed by the parent. Furthermore, if the recipient actually does perform functions in connection with the product, such as packaging, assembly, etc., it would be inequitable to exclude the resulting costs from the formula.

Taxable Year of the Recipient

Subdivision (iv) refers to costs or deductions related to the rendition of services during the taxable year of the recipient. Obviously, in order to apply objective standards to the principles expressed in subdivision (iv) it is necessary to confine the elements used (i.e., costs or deductions) to a specific time period. Practicality dictates that the time period used be the taxable year of the recipient.

There are two conflicting viewpoints as to the significance of the restriction to the taxable year of the recipient. One theory is that the restriction is merely a restriction with respect to which services are subject to the objective test, i.e., those services rendered during the taxable year, and that all costs or deductions related to those services, whether or not incurred [*59] during the taxable year, would be included in the test. Under this theory, if X agreed to undertake a market study for Y in year 1 and the results of the study were presented to Y in year 2, year 2 would be the year in which the services were "rendered" for purposes of the regulations. Thus, if X spent $50,000 on the study in year 1 and $50,000 on the study in year 2, the proper cost of services rendered would be $0 in year 1 and $100,000 in year 2. The result of this approach (in some cases) will be that there will not be a matching of income and deductions. That is, the renderer will have deductions in one year without the offsetting income and will have income in a subsequent year not fully offset by deductions. One of the rationales behind the cost safe-haven is that the recipient of the services could have employed the persons or facilities rendering the services and, therefore, no profit should be imputed. Consistent with this rationale, the recipient should incur the costs at the same time the renderer incurred them. The alternative theory is that the term "during the taxable year" restricts the test to costs or deductions incurred during the taxable year for services [*60] rendered during that same period. Applying this latter viewpoint to the above example, X rendered services for Y in both year 1 and year 2, and, hence, the cost of services in year 2 would be $50,000, the other $50,000 being cost of services in year 1.

These two conflicting theories have broader application than simply the objective test of subdivision (iv). They will come into consideration any place in the regulations in which the cost of services is a factor. The most important area being with respect to what allocation is to be made when the safe haven rule applies so that the arm's length charge for services is deemed equal to the costs or deductions related to the rendition of the services.

20

The fundamental concept on which the disagreement is based is whether costs can be incurred in one year and be related to services rendered in another year. Thus, in the case of the market study, supra, physical activities were engaged in by X in year 1 which were intended for the benefit of Y. Can it be said that services were not "rendered" for Y's benefit until the study was presented to Y in year 2? Certainly, it is not unusual business practice in such a situation for the [*61] renderer to defer any charge to the recipient until the recipient receives the benefit, i.e., the study. The resolution of the problem posed in the example may hinge on whether Y would have had to reimburse X for X's costs if the study were never completed. However, if the answer is in the negative, the transaction is more likely to be classified as a contract for the transfer of intangible property, i.e., the market study, than as a contract for the performance of services. Had X performed the market study for itself in year 1 and transferred the results of the study to Y in year 2, no part of the costs incurred by X in year 1 could be included in the cost of services rendered to Y for purposes of applying the subdivision (iv) formula in year 1.

Put in the context of the safe haven allocation, the latter theory (restriction to costs incurred during the taxable year) would mean that, when the safe haven rule applies, an allocation of deductions (from the various renderers to the recipient) results. Under the former theory, a safe haven allocation would be of income based on the cost incurred. Thus, if, in an arm's length transaction, a charge for the services would [*62] have been made in year 2, the safe haven rule would dictate that an arm's length charge would be deemed equal to all costs or deductions incurred with respect to the services regardless of the years in which they are incurred. Query--would the allocation of deductions theory require, in the example, that if the safe haven were not applied a charge would only be made in year 2, but if the taxpayer elected the safe haven route (assuming he could) two charges would result - one in year 1 and one in year 2?

It should be noted that the denominators of the fractions in subdivisions (ii) and (iv) are made up (in part) of "the total costs or deductions * * * [for the] * * * taxable year." Thus, if the costs of services are not restricted to costs incurred during the taxable year a comparison of the cost of activities occurring in more than one year (the numerator) to the cost of activities occurring only in one year (the denominator) will result. Additionally, many of the services involved will be of the type which are difficult to isolate and attribute to a particular entity. They will be allocated on some general basis, such as sales, gross income, etc. Hence, from an administrative [*63] viewpoint, it will generally be more practical to analyze costs year by year than to accumulate costs on a project basis over one or more years and make a single allocation.

Subdivision (v)

The examples at the end of subparagraph (7) which demonstrate the application of subdivisions (i) - (iv) have been changed considerably. These changes are mainly to conform the examples to the changes made in the subdivisions and to add new examples to illustrate additional principles.

# Tab B



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

SMALL BUSINESS/SELF EMPLOYED DIVISION

JUN 0 4 2007

Ms. Carol Gruenburg
Miller & Chevalier
655 Fifteenth Street, NW, Suite 900
Washington, DC 20005-5701

Dear Ms. Gruenburg:

This is in response to your Freedom of Information (FOIA) Act request dated
April 6, 2005 and received in our office on April 8, 2005 (copy enclosed).

We have been advised by the Chief, Disclosure & Litigation Support Branch that
the requested information relating to a transmittal memorandum dated April 9,
1968 (29 pages) which accompanied T.D. 6952 is being withheld in their entirety,
pursuant to the Freedom of Information Act 5 U.S.C. 552, in accordance with
subsection (b)(5).

Subsection (b)(5) of the Freedom of Information Act exempts from disclosure
inter-agency or intra-agency memorandums or letters which would not be
available by law to a party other than an agency in litigation with the agency. The
three primary privileges covered by this exemption are the deliberative process
privilege, the attorney work product privilege and the attorney-client privilege.

The deliberative process privilege protects documents which reflect advisory
opinions, recommendations, and deliberations comprising the process by which
decisions and policies are formulated. The attorney work product privilege
protects memorandums prepared by an attorney in contemplation of litigation
which sets forth the attorney's theory of the case and litigation strategy.

The attorney-client privilege protects confidential communications between an
attorney and a client relating to a legal matter for which the client has sought
professional advice.

You also requested a copy of a memorandum containing more detail on this
subject from this office to the office of the Assistant Commissioner (Technical),
which was originally attached to the transmittal memorandum for T.D. 6998. A
search was conducted by the Chief, Disclosure Litigation Support Branch and
they were unable to locate the document specifically responsive to your request.

Page 2.
Ms. Gruenburg

Notice 393, which describes the exemption and provides information concerning appeal rights, is enclosed

Should have any questions regarding this correspondence, you may contact Senior Disclosure Specialist, Sharon E. Baker, ID #50-00267, by calling (202) 238-0308 or by writing to: Internal Revenue Service, Baltimore Disclosure Office, SE:S:CLD:GLD:D3-FOIA, George Fallon Fed. Bldg., Room 940, 9th Floor, 31 Hopkins Plaza, Baltimore, MD 21201. Please refer to case number: 20-2005-01690.

Sincerely,

Joan D. McClean
Disclosure Manager
ID# 52-00489
Baltimore Disclosure Office

Enclosures

Information on an IRS Determination to Withhold Records Exempt From
The Freedom of Information Act – 5 U.S.C. 552

### Appeal Rights

You may file an appeal with the Internal Revenue Service (IRS) within 35 days after we (1) deny you access to a record in whole or in part; (2) have made an adverse determination as to your category as a requester; (3) deny your request for a fee waiver or reduction; or (4) have advised you that no records responsive to your request exist. You may file an appeal within 10 days when a request for expedited processing has been denied.

Your appeal _must_ be in writing, must be signed by you, and must contain:

> Your name and address,
> Description of the requested records,
> Date of the request (and a copy, if possible),
> Identity of the office and contact on the response letter, and
> Date of the letter denying the request (and a copy, if possible)

Mail your appeal to:

> IRS Appeals
> Attention: FOIA Appeals
> 5045 E. Butler Ave.
> M/Stop 55201
> Fresno, California 93727-5136

### Judicial Review

If we deny your appeal, or do not address an issue raised in your appeal within 20 days (excluding Saturdays, Sundays, or legal public holidays) after the date we receive your appeal, you may file a complaint in United States District Court in the district in which (1) you reside; (2) your principal place of business is located; (3) the records are located; or (4) the District of Columbia. A complaint may be filed within 10 days (excluding Saturdays, Sundays, or legal public holidays) after the date we receive your appeal if your appeal is from an adverse determination of a request for expedited processing. If you choose to file suit before receipt of a final determination by the Appeals office, the administrative appeals process may cease.

The rule for effecting service of judicial process upon the Internal Revenue Service is set forth in Federal Rule of Civil Procedure 4(i). In addition to service upon the United States, as set forth in Rule 4(i)(1), service must be made upon the Internal Revenue Service by registered or certified mail as set forth in Rule 4(i)(2)(A). The address of the Internal Revenue Service is: Internal Revenue Service, Attention CC:PA ,1111 Constitution Avenue, N.W., Washington, D.C. 20224.

### Exemptions

The Freedom of Information Act, 5 U.S.C. 552, does not apply to matters that are:

(b)(1) • specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and are in fact properly classified under such executive order.

(b)(2) • related solely to the internal personnel rules and practices of an agency;

(b)(3) • specifically exempted from disclosure by statute (other than section 552b of this title), provided that the statute

# Exhibit D

FROM : MILLER CHEVALIER    2026280858    TO:96223407    P.2/2

**MILLER & CHEVALIER**
CHARTERED

JAN 3 0 2006

655 FIFTEENTH STREET, N.W.  SUITE 900
WASHINGTON, D.C. 20005-5701
(202) 626-5800  FAX: (202) 628-0858

(202) 626-6094
January 27, 2006

HQ Disclosure Office
1111 Constitution Ave, NW
Room 1571
Washington, DC    20224

Dear Sirs:

Please provide me with copies of the following materials under the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA"), Internal Revenue Code §6110, and the applicable regulations thereunder (31 C.F.R. § 1, et seq., and 26 C.F.R. § 601.702, et seq.), relating to:

- o **All background, administrative and legal materials, including but not limited to internal IRS memoranda, hearing transcripts, analyses, and public comments filed regarding IRS Regulation 1.482-2(b) from 1965 through 1969:**
  - o **Proposed in April, 1965.  (30 Fed.Reg. 4256)**
  - o **Withdrawn and Reproposed in August, 1966.  (31 Fed.Reg. 10394)**
  - o **Final, TD 6952, in April, 1968.  (33 Fed.Reg. 5848)**
  - o **Proposed changes in April, 1968.  (33 Fed.Reg. 5858)**
  - o **Final, TD 6998, in January, 1969.  (34 Fed.Reg. 933)**

In compliance with applicable regulations for "Commercial Use Requester," we promise to pay reasonable charges for search, copying and review costs.  I understand that I can expect a response within 20 days of your receipt of this letter.

If you have any questions about this request, I may be reached at: (202) 626-6094.  I look forward to your response within twenty days, or earlier if possible.  Thank you.

Sincerely,

Carol Gruenburg
Director of Library Services

# Exhibit E

**MILLER & CHEVALIER**
CHARTERED

655 FIFTEENTH STREET, N.W.  SUITE 900
WASHINGTON, D.C  20005-5701
(202) 626-5800  FAX: (202) 628-0858

(202) 626-6094
February 24, 2006

HQ Disclosure Office
1111 Constitution Ave, NW
Room 1571
Washington, DC    20224

Dear Sirs:

Please provide me with copies of the following materials under the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA"), Internal Revenue Code §6110, and the applicable regulations thereunder (31 C.F.R. § 1, et seq., and 26 C.F.R. § 601.702, et seq.), relating to:

> o  **All background, administrative and legal materials, including but not limited to internal IRS memoranda, hearing transcripts, analyses, and public comments filed regarding IRS Notice of Proposed Rulemaking for REG-146893-02 and REG-115037-00 (68 Fed.Reg. 53448, 9/10/2003).**

In compliance with applicable regulations for "Commercial Use Requester," we promise to pay reasonable charges for search, copying and review costs.  I understand that I can expect a response within 20 days of your receipt of this letter.

If you have any questions about this request, I may be reached at: (202) 626-6094.  I look forward to your response within twenty days, or earlier if possible.  Thank you.

Sincerely,

Carol Gruenburg
Carol Gruenburg
Director of Library Services

271960.1

*Exxon.*                                    *McMahon*

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Parts 1 and 31**

**[REG–146893–02, REG–115037–00]**

**RIN 1545–BB31, 1545–AY38**

**Treatment of Services Under Section 482; Allocation of Income and Deductions From Intangibles**

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Notice of proposed rulemaking and notice of public hearing.

**SUMMARY:** This document contains proposed regulations that provide guidance regarding the treatment of controlled services transactions under section 482 and the allocation of income from intangibles, in particular with respect to contributions by a controlled party to the value of an intangible that is owned by another controlled party. These proposed regulations potentially affect controlled taxpayers within the meaning of section 482. The proposed regulations provide updated guidance that is necessary to reflect economic and legal developments since the issuance of the current guidance. This document also provides a notice of public hearing on these proposed regulations.

**DATES:** Written or electronic comments must be received December 9, 2003. Outlines of topics to be discussed at the public hearing scheduled for January 14, 2004, at 10 a.m. must be received by December 23, 2003.

**ADDRESSES:** Send submissions to CC:PA:LPD:PR (REG–146893–02 and REG–115037–00), room 5203, Internal Revenue Service, POB 7604, Ben Franklin Station, Washington, DC 20044. Submissions may be hand delivered Monday through Friday between the hours of 8 a.m. and 4 p.m. to: CC:PA:LPD:PR (REG–146893–02 and REG–115037–02), Courier's desk, Internal Revenue Service, 1111 Constitution Avenue, NW., Washington, DC 20044. Alternatively, taxpayers may submit electronic comments directly to the IRS Internet site at *www.irs.gov/regs*. The public hearing will be held in the auditorium, Internal Revenue Building, 1111 Constitution Avenue, NW, Washington, DC.

**FOR FURTHER INFORMATION CONTACT:** Concerning the proposed regulations, J. Peter Luedtke or Helen Hong-George, (202) 435–5265; concerning submissions of comments, the hearing, and/or to be placed on the building access list to attend the hearing, Sonya M. Cruse, (202) 622–7180 (not toll-free numbers).

**SUPPLEMENTARY INFORMATION:**

### Background

Section 482 of the Internal Revenue Code generally provides that the Secretary may allocate gross income, deductions and credits between or among two or more taxpayers owned or controlled by the same interests in order to prevent evasion of taxes or to clearly reflect income of a controlled taxpayer. Comprehensive regulations under section 482 published in the **Federal Register** (33 FR 5849) on April 16, 1968, provided guidance with respect to a wide range of controlled transactions, including transfers of tangible and intangible property and the provision of services. Revised and updated transfer pricing regulations were published in the **Federal Register** (59 FR 34971, 60 FR 65553 and 61 FR 21955) on July 8, 1994, December 20, 1995, and May 13, 1996.

#### A. Services Transactions

While comprehensive in other respects, the regulations issued in the mid-1990s did not modify substantively the 1968 regulations relating to controlled services transactions. The current services regulations at § 1.482–2(b) provide generally that where one member of a controlled group performs services for the benefit of another member without charge, or at a charge that is not equal to an arm's length charge, the Commissioner may make appropriate allocations to reflect an arm's length charge for such services. The determination of the arm's length charge depends on whether the services transaction is an "integral part" of the business of the renderer or recipient of the services. The current services regulations provide several overlapping quantitative and qualitative tests to determine whether a services transaction is integral.

Under the current services regulations, the arm's length charge for non-integral services is deemed to be equal to the "costs or deductions" incurred with respect to the services, unless the taxpayer establishes that another charge is more appropriate. General guidance is provided regarding the definition of cost and the appropriate allocation of costs to particular services.

The arm's length charge for integral services under the current services regulations is "the amount which was charged or would have been charged for the same or similar services in independent transactions with or between unrelated parties under similar circumstances considering all relevant facts." No guidance is provided

regarding the methods that may be used to determine whether a charge is consistent with an arm's length charge.

#### B. Income Attributable to Intangibles

The Treasury Department and the IRS issued final regulation § 1.482–4(f)(3) as part of the 1994 regulations. The preamble to those regulations states that the rules of § 1.482–4(f)(3) were necessary in order "to identify the controlled taxpayer that should recognize the income attributable to intangible property." Section 1.482–4(f)(3) identifies that party by providing rules to determine the owner, for section 482 purposes, of the rights to exploit an intangible to which income was attributable. Under those rules, the legal owner of an intangible, the taxpayer with a right to exploit the intangible, and even a taxpayer that contributes to the development or enhancement of the intangible could be deemed "owners" of that intangible, entitled to a portion of the income attributable to the intangible.

### Explanation of Provisions

#### A. Overview

These proposed regulations provide updated guidance under section 482 that replaces existing guidance under § 1.482–2(b) relating to controlled services transactions and existing guidance under § 1.482–4(f)(3) relating to the allocation of income attributable to intangible property. These proposed regulations also make conforming and other changes to provisions of the current regulations under sections 482 and 6662 that are related to this guidance.

#### 1. Services Transactions

These proposed regulations provide updated guidance under section 482 relating to controlled services transactions. The Treasury Department and the IRS believe that such guidance is necessary to reflect economic and legal developments since the issuance of the 1968 regulations. In the last 35 years, cross-border services have become an increasingly large and important segment of the U.S. and global economies. In particular, cross-border services transactions make up an increasingly significant segment of cross-border transactions among members of controlled groups.

Legal developments in the transfer pricing area since 1968 include the amendment of section 482 in 1986 to provide for the commensurate with income standard in the context of transfers of intangible property and the issuance in the mid-1990s of updated

FEDERAL REGISTER

Vol. 69, No. 123

Unified Agenda

DEPARTMENT OF THE TREASURY

**31 CFR Subtitle A, Chs. I and II**

**Semiannual Agenda**

Part XVI

69 FR 37965

**DATE:** Monday, June 28, 2004

--------------------------------------------------------

**2797. TREATMENT OF SERVICES UNDER SECTION 482**

**Priority:** Substantive, Nonsignificant

**Legal Authority:** 26 USC 7805; 26 USC 482

**CFR Citation:** 26 CFR 1

**Legal Deadline:** None

**Abstract:** Those final regulations amend the rules for allocation of income and deductions with respect to serices between members of a group of controlled entities, pursuant to section 482.

| Timetable: | | |
|---|---|---|
| **Action** | **Date** | **FR Cite** |
| NPRM | 09/10/03 | 68 FR 53448 |
| Final Action | 12/00/04 | |

**Regulatory Flexibility Analysis Required:** No

**Small Entities Affected:** No

**Government Levels Affected:** None

**Additional Information:** REG-146893-02

Drafting attorneys: Thomas A. Vidano (202) 435-5265 and Helen Hong-George (202) 435-5220

Reviewing attorneys: John M. Breen (202) 435-5265

Treasury attorney: Rocco Femia (202) 622-1755

CC:INTL

**Agency Contact:** Thomas A. Vidano, Attorney-Advisor, Department of the Treasury, Internal Revenue Service, 1111 Constitution Avenue NW, Washington, DC 20224
Phone: 202 435-5265

**Rin:** 1545-BB31

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Miller & Chevalier Chartered | Internal Revenue Service |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     Washington, DC | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT     Washington, DC |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Shane T. Hamilton, Kevin L. Kenworthy<br>Miller & Chevalier Chartered<br>655 Fifteenth St., NW, Suite 900<br>Washington, DC 20005<br>(202) 626-5800 | |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government Plaintiff

⊙ 2 U.S. Government Defendant

O 3 Federal Question (U.S. Government Not a Party)

O 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**O A. Antitrust**

☐ 410 Antitrust

**O B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**O C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**O D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**O E. General Civil (Other)    OR    O F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ⊙ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
5 U.S.C. Sec. 552; Compel production of agency records.

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   **DEMAND $** _____   Check YES only if demanded in complaint   **JURY DEMAND:** YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 8/14/07    SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.